# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) | **Civil Action No.:** |
| IN RE GALECTIN THERAPEUTICS, | ) | **1:15-CV-0029-SCJ** |
| INC. SECURITIES LITIGATION | ) |  |
|  | ) | <u>CLASS ACTION</u> |
| _____ | ) |  |

## CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     NATURE OF THE ACTION ................................................................ 1

III.    JURISDICTION AND VENUE ........................................................... 3

IV.     PARTIES ............................................................................................. 4

    A.      Lead Plaintiff ........................................................................... 4

    B.      Defendants ................................................................................ 4

V.      DEFENDANTS' SCHEME .................................................................. 8

    A.      Galectin Attempts to Reinvent Itself ........................................ 8

    B.      Galectin Relies on At-Market Offerings to Finance Its Clinical Trial of GR-MD-02 ....................................................... 10

    C.      Defendants Secretly Use Stock Promoters to Artificially Inflate the Price of Galectin's Common Stock Sold in ATM Offerings ............................... 12

        i.      The Stock Promoters ..................................................... 12

        ii.     Galectin and the Hired Stock Promoters Coordinate the Timing of Their Public Statements to Coincide with the Company's ATM Offerings ....................................................................... 18

    D.      Defendants Misrepresent That They Do Not Manipulate the Price of Shares Being Sold in the ATM Offerings ........................... 23

    E.      The Truth Is Revealed .............................................................. 24

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................. 26

    A.      The Company's Press Releases and SEC Filings Were Materially False and Misleading ................................................. 26

        i.      The October 25, 2013 ATM Offering ............................. 26

        ii.     3Q13 Form 10-Q ........................................................... 27

        ii.     January 10, 2014 Press Release ..................................... 27

        iii.    2013 Form 10-K ............................................................ 29

        iv.     The March 21, 2014 ATM Offering ............................... 30

        v.      1Q14 Form 10-Q ........................................................... 31

    B.      The Stock Promoters' Articles Omitted Material Facts ................ 32

        i.      The Dream Team ........................................................... 32

        ii.     Cox ............................................................................... 32

        iii.    TDM .............................................................................. 34

        iv.     Acorn ............................................................................ 34

VII.    ADDITIONAL SCIENTER ALLEGATIONS ..................................... 35

VIII.   LOSS CAUSATION ............................................................................ 38

i

IX.   LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A
      PRESUMPTION OF RELIANCE ........................................................................ 39

X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
      DOCTRINE ARE INAPPLICABLE .................................................................... 41

XI.   CLASS ACTION ALLEGATIONS ...................................................................... 42

XII.  CAUSES OF ACTION ......................................................................................... 44

XIII. PRAYER FOR RELIEF ........................................................................................ 51

JURY TRIAL DEMAND .................................................................................................... 53

## I.     INTRODUCTION

Lead Plaintiff Glyn Hotz ("Lead Plaintiff") makes the following allegations against defendants Galectin Therapeutics, Inc. ("Galectin" or the "Company"), 10X Fund L.P. (the "10X Fund"), James C. Czirr ("Czirr"), Rod D. Martin ("Martin"),  Peter G. Traber ("Traber"), Jack W. Callicutt ("Callicutt"), and John F. Mauldin ("Mauldin") (collectively, "Defendants").[1] Except as to allegations specifically pertaining to Lead Plaintiff and Lead Plaintiff's counsel, the allegations herein are based upon an investigation undertaken by Lead Plaintiff's counsel, which included, but was not limited to, the review and analysis of:  (i) Galectin's public filings with the United States Securities and Exchange Commission ("SEC"); (ii) securities analysts' reports about Galectin; (iii) Galectin's press releases; (iv) media reports concerning Galectin, including online news sources; and (v) interviews with former Galectin employees.  Lead Plaintiff believes that additional evidentiary support will exist for the allegations herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

## II.     NATURE OF THE ACTION

1.     This federal securities class action is brought on behalf of all persons who purchased Galectin common stock between October 25, 2013 and July 28, 2014, inclusive (the "Class Period"), and were damaged thereby (the "Class"), seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.     Galectin is a developmental stage biotechnology ("biotech") company engaged in the research of galectin proteins to develop therapies for cancer and non-alcoholic steatohepatitis ("NASH"), or "fatty liver disease" with advanced fibrosis.  The Company's lead product is GR-

---

[1] All emphasis is added unless otherwise noted.

1

MD-02, a complex polysaccharide polymer for the treatment of fatty liver disease with advanced fibrosis.

3.      As with all small biotech companies, the rise and fall of the business is dependent upon the company receiving Food and Drug Administration ("FDA") approval of its existing drug candidates.   However, during the developmental process and before a small biotech company receives FDA approval, the principal means of generating revenue is through the use of secondary offerings, *i.e.*, raising money by issuing company stock.

4.      This was no different for Galectin.  While Galectin was proceeding with Phase I-testing of GR-MD-02, and with very limited sources of revenue available, on October 25, 2013, the beginning of the Class Period, Galectin launched an "at-the-market" ("ATM") offering of up to $30 million of Company stock (the "October 25, 2013 ATM Offering").  Later, on March 21, 2014, Galectin began a second Class-Period ATM offering of up to another $30 million of Company stock (the "March 21, 2014 ATM Offering" and together with the October 25, 2013 ATM Offering, the "ATM Offerings").  The funds raised through these ATM Offerings were to be used to fund the completion of Phase I testing, as well as the implementation of Phase II testing on the drug.

5.      In connection with and underlying these ATM Offerings, Galectin entered into an At Market Issuance Sales Agreement with MLV & Co. ("MLV"), which was amended on March 21, 2014 (the "At-Market Agreement").  Therein, Galectin explicitly represented that it would not take any action that would result in the "manipulation" of the price of its common stock that Galectin was offering for sale.  Notwithstanding this pledge to Class members, Defendants secretly retained various third-party stock promoters to publish allegedly "independent" articles that exceedingly touted and exaggerated, among other things: (i) the purported efficacy of GR-

MD-02; and (ii) Galectin's competitiveness with another biotech firm similarly engaged in the development of a drug treatment for NASH, Intercept Pharmaceuticals ("Intercept").  In other words, contrary to their Class-Period representations, Defendants retained these stock promoters to flood the market with sensationalized information about Galectin and GR-MD-02 that, under the securities laws, they could not themselves disseminate.  At the same time, Galectin failed to adequately disclose its relationship with these third parties.

6.      The stock promoters' published articles had the effect of manipulating Galectin's stock by helping to artificially inflate its price.  In turn, this artificially inflated stock price allowed Defendants to sell less stock in the Company's ATM offerings at higher prices, thereby limiting the dilution of their own holdings while raising the funds necessary to continue to finance the ongoing testing of GR-MD-02.

7.      The Defendants' fraudulent scheme was finally exposed on July 28, 2014 when Bleecker Street Research and Adam Feuerstein published articles on the websites *Seeking Alpha* (the "Bleecker Street Research Article") and *TheStreet* (the "July 28, 2014 Feuerstein Article"), respectively, revealing that Galectin had been using stock promoters to issue inaccurate and boastful stories about the Company in order to entice investors to buy its stock at artificially inflated prices.  On this news, Galectin's stock plummeted from an opening price of $15.91 per share on July 28, 2014 to open at $7.10 per share on July 29, 2014—a decline of ***over 55%***.

## III.   JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act and 28 U.S.C. § 1331.

9.     Venue is proper in the Northern District of Georgia pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 77v, and 28 U.S.C. § 1391(b).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of materially false and misleading information and the scheme to manipulate the price of the Company's common stock, occurred in this District.  In addition, the Company is headquartered in this District with its principal executive offices located in Norcross, Georgia.

10.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

### A.    Lead Plaintiff

11.     Lead Plaintiff, Glyn Hotz, purchased shares of Galectin common stock during the Class Period and suffered losses as a result of the conduct complained of herein.  Lead Plaintiff's Class-Period transactions in Galectin common stock are reflected on the certification attached hereto as Exhibit A.

### B.    Defendants

12.     Defendant Galectin is incorporated in Nevada and headquartered in Norcross, Georgia.  During the Class Period, Galectin maintained executive offices in Norcoss, Georgia. Galectin is an early-stage biotech company that researches and develops drugs designed to treat NASH with advanced fibrosis and cancer.  Galectin common stock is traded on the NASDAQ under the symbol "GALT."

13.     Defendant 10X Fund and its general partner, 10X Capital Management, LLC, ("10X Management") (collectively, "10X") were co-founded by Defendants Czirr and Martin in 2008 as a technology-focused hedge fund headquartered in Niceville, Florida.  In 2009, 10X

conducted a takeover and restructuring of Galectin's predecessor company, Pro-Pharmaceuticals, Inc. ("Pro-Pharma").  As of March 20, 2015, Defendant 10X Fund owned all of the issued and outstanding shares of Galectin Series B preferred stock, which are convertible into 2,000,000 shares of Galectin's common stock, as well as warrants exercisable to purchase an aggregate of 4,000,000 shares of Galectin common stock.  Additionally, Defendant Czirr, a managing partner of Defendant 10X Fund and Executive Chairman of Galectin's Board of Directors (the "Board"), owned or controlled approximately 817,000 shares of Galectin common stock, including shares of Series A on an as-converted basis, and had the right to acquire approximately 811,000 additional shares of Galectin's common stock upon the exercise of outstanding stock options (approximately 631,000 of which became exercisable as of December 31, 2014).  Defendant Martin, a managing partner of the 10X Fund and Vice Chairman of Galectin's Board, owned or controlled approximately 175,000 shares of Galectin common stock and had the right to acquire approximately 41,000 additional shares of Galectin common stock upon the exercise of outstanding stock options (approximately 34,000 of which became exercisable as of December 31, 2014).  Thus, as of December 31, 2014 (on a fully diluted basis, assuming conversion of all Series B Preferred Stock and exercise of all outstanding warrants), the 10X Fund would own approximately 31% of Galectin's then-outstanding shares of common stock. Furthermore, through its ownership of Galectin Series B preferred stock, Defendant 10X Fund was, at all relevant times, entitled to:  (i) elect three directors to the Company's Board in a separate class vote; (ii) nominate three directors for election by all shares entitled to vote; and (iii) provide or withhold consent to a range of fundamental corporate actions that the Company may have wished to undertake, such as recapitalization, sale of the Company, and other matters.

14.     Defendant Czirr served as Executive Chairman of the Board during the Class Period.  Defendant Czirr co-founded Galectin's predecessor company, Pro-Pharma, in July 2000.  Defendant Czirr, along with Defendant Martin, is also a co-founder of Defendant 10X Fund and a managing member of 10X Management.  Through 10X, Defendant Czirr, along with Defendant Martin, led the takeover and restructuring of Galectin's predecessor company, Pro-Pharma, in 2009.  As of March 31, 2015, Defendant Czirr owned or controlled approximately 817,000 shares of Galectin common stock, including shares of Series A on an as-converted basis, and had the right to acquire approximately 811,000 additional shares of Galectin's common stock upon the exercise of outstanding stock options (approximately 631,000 of which became exercisable as of December 31, 2014).

15.     Defendant Martin served as Vice Chairman of the Board during the Class Period.  Defendant Martin, along with Defendant Czirr, is a co-founder of Defendant 10X Fund and a managing member of 10X Management.  Through 10X, Defendant Martin, along with Defendant Czirr, led the takeover and restructuring of Galectin's predecessor company, Pro-Pharma, in 2009.  As of March 31, 2015, Defendant Martin owned or controlled approximately 175,000 shares of Galectin common stock and had the right to acquire approximately 41,000 additional shares of Galectin common stock upon the exercise of outstanding stock options (approximately 34,000 of which became exercisable as of December 31, 2014).

16.     Defendant Traber served as the President, Chief Executive Officer ("CEO"), Chief Medical Officer ("CMO"), and director of Galectin during the Class Period.  As of March 20, 2015, Defendant Traber owned or controlled approximately 1,405,276 shares of Galectin common stock, including 100,000 shares issuable upon his exercise of warrants.

17.     Defendant Callicutt served as the Chief Financial Officer ("CFO") of Galectin during the Class Period.  As of March 20, 2015, Defendant Callicutt owned or controlled approximately 99,035 shares of Galectin common stock.

18.     Defendant Mauldin served as a director of the Company during the Class Period. At all relevant times, Defendant Mauldin published investment advice to paying subscribers through his website, Mauldin Economics.  Mauldin Economics employed various editors, including, among others, Patrick Cox ("Cox"), who contributed research on small-cap biotech companies through a fee-based publication titled "Transformational Technology Alert."  As alleged herein, Cox was one of four stock promoters that Galectin retained during the Class Period to write articles touting the Company to investors as part of the Company's stock promotion scheme.  As of March 20, 2015, Defendant Mauldin owned or controlled approximately 53,662 shares of Galectin common stock.

19.     Defendants, Czirr, Martin, Traber, Callicutt, and Mauldin are referred to collectively herein as the "Individual Defendants."

20.     Defendants Galectin and the Individual Defendants are liable under Section 10(b) for making the false and misleading statements and omissions and/or participating in the fraudulent scheme alleged herein.  In addition, each of the Individual Defendants and Defendant 10X Fund was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  By reason of their control of Galectin, the Individual Defendants and Defendant 10X Fund were able to and did, directly or indirectly, control the day-to-day conduct of Galectin's business and are liable for any false and misleading statements and omissions alleged herein that are attributable to Galectin.

## V.   DEFENDANTS' SCHEME

### A.   Galectin Attempts to Reinvent Itself

21.     The Company was not always known as Galectin, nor was it always focused on the development of a drug treatment for NASH with advanced fibrosis.  Rather, Galectin had a predecessor company known as Pro-Pharma that was plagued with a troubled past.  Among other indiscretions, Pro-Pharma misleadingly promoted the progress of its own floundering drug trial.  Thus, well before Galectin sought the FDA's permission in January 2013 to conduct a Phase I clinical trial of its new lead drug candidate, GR-MD-02, the Company shed the Pro-Pharma name (and stigma associated with it) and reinvented itself as "Galectin."

22.     By way of background, Pro-Pharma, like Galectin, had engaged solely in the development of a single drug called Davanat—a galectin inhibitor that the Company touted as a boosting agent for the chemotherapy of colon cancer.  Pro-Pharma's sole operational objective was to raise funds sufficient to carry Davanat through the various clinical phases of the FDA approval process.  Because Pro-Pharma was exclusively engaged in the development of Davanat, its profitability was contingent upon the successful completion of Davanat's clinical trial.

23.     Over an eight-year period, from 2003 to 2011, Pro-Pharma continually insisted that it was in the process of seeking the FDA's approval for Davanat.  Despite such assurances, by 2011, Pro-Pharma still had not commenced a Phase III study of the drug.  By this point, it was starting to become clear to the market that Davanat would not be approved by FDA.

24.     As its protracted promotional campaign of Davanat was failing to live up to the hype, Pro-Pharma undertook a series of actions in an attempt to revamp its image.  First, on May 26, 2011, Pro-Pharma announced that it had changed its name to Galectin.  Around the same time, the Company seemingly phased out the Davanat study and decided to develop the very same drug—now under the moniker GM-CT-01—for a totally different purpose—cancer

8

immunotherapy for the treatment of melanoma.  Ostensibly, this shift was driven by the fact that cancer immunotherapy was a "hot trend" in the biotech sphere at the time.  Subsequently, on March 28, 2012, the Company conducted an Initial Public Offering ("IPO") for the purpose of listing its common stock on the NASDAQ.

25.     During 2012 and early 2013, Galectin teamed with the Cancer Centre at the Cliniques Universitaires Saint-Luc and the Ludwig Institute for Cancer Research (LICR) to conduct Phase I and II studies of GM-CT-01 for cancer immunotherapy of patients with advanced metastatic melanoma.  Despite the Company's best efforts, the Phase I and II clinical trials of GM-CT-01 yielded no objective results demonstrating the drug's efficacy.

26.     Forced to start over again, Galectin redirected its focus toward developing a new "lead product" candidate.  At the time, numerous biotech firms had entered the race to develop a drug treatment for NASH.  The primary catalyst for this trend was the phenomenal market performance of Intercept and its lead drug candidate, obeticholic acid ("OCA").  In fact, in January 2013, just after releasing OCA's positive Phase II efficacy results, Intercept's stock price skyrocketed from roughly $20 per share to a high of $445 per share.

27.     Galectin sought to piggy-back on Intercept's success.  On January 31, 2013 Galectin jumped onto the NASH bandwagon, announcing that it had submitted to the FDA an Investigational New Drug ("IND") application to conduct a study of its new drug candidate, GR-MD-02, for the treatment of NASH with advanced fibrosis.  Thereafter, on February 1, 2013, Galectin announced that it had entered into an agreement with CTI Clinical Trial Services, Inc. ("CTI") to conduct a Phase I clinical trial of GR-MD-02 to assess the drug's "safety and preliminary evidence of efficacy in humans."  One month later, in March 2013, the Company received notification from the FDA that it could commence its Phase I clinical trial of GR-MD-

02 for the treatment of patients with NASH.  Accordingly, in July 2013, GALT began enrolling the first cohort of patients in this Phase I study.

### B.   Galectin Relies on At-Market Offerings to Finance Its Clinical Trial of GR-MD-02

28.     As a developmental-stage biotech company, Galectin does not generate revenue because its "leading products" are still pending the FDA's approval for commercialization. Thus, in order to fund the costly development of GR-MD-02, Galectin has relied upon the issuance of stock and debt to raise capital for its daily operations.

29.     In this regard, on October 25, 2013, Galectin announced in a report filed with the SEC on Form 8-K (the "October 25, 2013 Form 8-K") that it had entered into the At-Market Agreement.  The At-Market Agreement provided that from time to time through MLV, acting as its agent, the Company could offer and sell Galectin common stock pursuant to the Company's Prospectus Supplement filed with the SEC on Form 424B5 (the "October 25, 2013 Prospectus Supplement") in connection with the Company's Registration Statement on Form S-3 filed with the SEC on March 16, 2011 (the "March 16, 2011 Registration Statement").  The offer and sale of shares could be by any method deemed an "at the market" offering, as defined in Rule 415 under the Securities Act of 1933 ("Securities Act").  According to the October 25, 2013 Prospectus Supplement, the Company "intend[ed] to use the net proceeds of [the October 25, 2013 ATM Offering] for the continued development of [its] drug research and development programs, including the current clinical trial for GR-MD-02, and for general corporate purposes."  Moreover, the October 25, 2013 Prospectus Supplement specifically acknowledged as a risk factor associated with the October 25, 2013 ATM Offering the "immediate and substantial dilution" to the value per share of Galectin's common stock.

30.     Galectin's announcement of the October 25, 2013 ATM Offering was received by the market with skepticism.  As one commentator wrote on November 7, 2013:

> Galectin's ATM was announced a week after the stock hit an all-time high of $12.45 per share.  You could say that the company is being smart and opportunistic, but the market tends to view the dilution and opacity of ATMs bearishly.  At Thursday's close, the stock is down 28% from its high.

31.     The commentator further noted that "Galectin's current cash runs out in the second quarter of next year."

32.     Indeed, Defendants were under intense pressure not only to raise funds to keep the business and clinical trial afloat, but also to keep the stock price elevated in order to minimize the dilution risk to the significant shares of Company stock that they held.

33.     Later, the Company disclosed in a press release attached to the Company's Form 8-K filed with the SEC on January 10, 2014 (the "January 10, 2014 Press Release") that in connection with the October 25, 2013 ATM Offering, during the period October 28, 2013 through January 9, 2014, Galectin had sold a total of 2,391,204 shares of its common stock at an average price per share of $9.99, for total gross proceeds of $23,883,137.

34.     On March 21, 2014, Galectin filed with the SEC a Registration Statement on Form S-3 and accompanying Base Prospectus and Sales Agreement Prospectus, which provided for the sale of up to another $30 million in shares of Galectin common stock by the Company from time to time again through MLV, acting as its agent, in accordance with the terms of the At-Market Agreement, as amended.  The Company advised that the net proceeds from the March 21, 2014 ATM Offering would be used to finance the GR-MD-02 clinical trial.  Galectin further acknowledged that the March 21, 2014 ATM Offering presented a risk of dilution to the value per share of the Company's common stock.

35.     Notably, due in large part to the efforts of Galectin's retained stock promoters (as detailed below), the Company's shares were trading at an average price of $15.31 per share when it announced the March 21, 2014 ATM Offering.  As subsequently disclosed in Galectin's annual report for the year ended December 31, 2014 filed on Form 10-K with the SEC on March 18, 2015 (the "2014 Form 10-K"), "[a]s of December 31, 2014, the Company had issued 217,622 shares of its common stock through [the March 21, 2014 ATM Offering] resulting in gross proceeds of approximately $1,196,000."

### C.     Defendants Secretly Use Stock Promoters to Artificially Inflate the Price of Galectin's Common Stock Sold in ATM Offerings

36.     In contrast to traditional follow-on stock offerings that provide for the sale of a finite number of shares at a fixed price and on a specified date, the At-Market Agreement authorized Galectin to sell shares of its common stock with an aggregate value of up to $30,000,000 "from time to time" and "by any method deemed 'at the market.'"  In other words, the timing of Galectin's ATM Offerings was within Galectin's sole discretion, enabling the Company to sell shares of its common stock whenever they were trading at a high price.  That way, the total number of shares issued to generate maximum proceeds could remain as low as possible, which, in turn, would reduce dilution to the investments of Galectin's preexisting shareholders—most of whom included Defendants.  As alleged above, the Company explicitly identified the "immediate and substantial" risk of dilution associated with each of its ATM Offerings.  Thus, Defendants had a strong motive and incentive to artificially inflate the price of Galectin's common stock in order to mitigate this risk.

#### i.     The Stock Promoters

37.     Galectin retained multiple stock promoters (none of whom were disclosed by the Company at the time they issued their reports and articles) to artificially pump up the price of its

common stock being issued in the ATM Offerings.  An SEC investor bulletin explains the use of stock promoters, stating that "some microcap companies pay stock promoters to recommend or 'tout' the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows."  To protect investors from being misled by such materials, the federal securities laws require stock promoters to disclose the entity that retained them and the amount and type of any payments that they received as compensation for their engagement.

38.    As alleged in further detail below, Galectin hired at least four such stock promoters to increase the price of the Company's stock sold in the ATM Offerings by issuing exceedingly boastful and manipulative articles.  These stock promoters included the following: (i) The Dream Team/Mission IR ("The Dream Team""); (ii) Cox; (iii) TDM Financial/Emerging Growth Corp. ("TDM"); and (iv) Acorn Management Partners, LLC ("Acorn") (collectively, the "Stock Promoters").  Galectin, however, failed to disclose its relationship with three of these Stock Promoters (The Dream Team, Cox, and TDM) during the Class Period.  As for the fourth Stock Promoter, Galectin indirectly reported that it had entered into a "consulting agreement" with Acorn, but omitted detail regarding the so-called "consulting" services rendered by Acorn under this arrangement.  In addition, the Company's limited disclosure about Acorn occurred four months after the Company had initially engaged Acorn and well after Acorn published its manipulative statements in March of 2014 about Galectin.

39.    As a result of these paid relationships with the Stock Promoters, under the law of agency, the Stock Promoters became agents of the Company for purposes of publishing the manipulative and boastful articles discussed herein.  By receiving payment from Galectin to

publish these articles, the Stock Promoters acted under the control and discretion of the Company.

**The Dream Team**

40.     Galectin retained The Dream Team to publish articles designed to boost the price of the Company's common stock under The Dream Team's "Investor Relations Brand," Mission IR.  Between the fall of 2012 and December 2014, The Dream Team published no less than seven (7) articles touting Galectin, GR-MD-02, and the Company's stock.  In one such article titled "Investors Should Consider Galectin Therapeutics (GALT)" and published on February 10, 2014—the very same day that the Company publicly filed with the SEC a current report on Form 8-K (the "February 10, 2014 Form 8-K") that attached a corporate presentation on its Phase I study of GR-MD-02—The Dream Team explicitly urged investors to purchase Galectin's common stock, highlighting, among other facts, that "*GR-MD-02 demonstrated that it proved [sic] NASH activity significantly. Not only was this good news, but it also reduced fibrosis preventing/reducing the accumulation of collagen [sic] in the liver.  There was also a reduction in galectin-3 and other inflammatory biomarkers*."

41.     Galectin itself never disclosed to shareholders that it was paying The Dream Team to publish promotional articles to artificially inflate the price of Galectin stock.  In addition, none of the articles issued between the fall of 2012 and December 2014 disclosed that Galectin had paid The Dream Team to publish them.  In fact, in each of the seven articles published during this timeframe, The Dream Team's general compensation disclaimer patently omitted Galectin from its list of paying clients.

**Cox**

42.     Prior to and during the Class Period, Cox wrote no less than twenty-three (23) articles promoting the efficacy of Galectin's drug candidates and generally overpraising the Company.

43.     Galectin never disclosed to shareholders that it had engaged Cox to publish exceedingly boastful and manipulative articles in order to artificially inflate the price of Galectin stock.

44.     Cox was retained because he could easily be manipulated by Galectin due to his deep-rooted relationship with Defendant Mauldin.

45.     In that regard, Defendant Mauldin had employed Cox as the editor of Mauldin Economics' fee-based newsletter, *Transformational Technology Alert*.   Through this relationship, Defendant Mauldin published a string of articles authored by Cox about Galectin.

46.     Cox's articles promoting Galectin were published on the Mauldin Economics website (without disclosing the relationship between Cox and Galectin), where they were touted as the product of expert investment knowledge and experience.

47.     This was not the first time that Defendant Mauldin had used Cox to publish misleading and sensationalized articles about a biotech company in which Defendant Mauldin had an economic interest.   In particular, in March 2011, Defendant Mauldin published on Mauldin Economics Cox's alleged "research" concerning the efficacy of another small biotech company's drug product.   That company was called BioTime, and, just like with Galectin, Defendant Mauldin owned shares in BioTime.   The day Cox's report was published, BioTime's stock jumped 14%, from $6.81 to $7.75, on heavy trading volume.

48.     Cox's sham promotions of BioTime were highly criticized.   Among other things, the alleged "research" articles were called out as "dubious" and "outlandish."

**TDM**

49.     Galectin retained TDM to publish articles designed to boost the price of its common stock.  During the Class Period, TDM published no less than six (6) such sensational and misleading articles about the Company.  In one such article published on July 24, 2014, for example, TDM boldly claimed:

> Galectin, a newly-coined member of the Russell 2000, ***is nipping at Intercept's heels and actually may be closer than what first appears with a Phase 1 trial because of the potential to treat fatty liver disease even once it has progressed.*** What distinguishes their approach from others [sic] that the timing of intervention with their proprietary carbohydrate polymer drug GR-MD-02 may be largely irrelevant to outcomes, ***with GR-MD-02 seeming to work well even in advanced stages of liver fibrosis***.

50.     Galectin has never disclosed its relationship with TDM.  The only ways an investor would have been able to determine that any relationship existed would have been for the investor to:  (i) visit SECFilings.com for the "full disclosure" of TDM's disclaimer, where, after scrolling through multiple paragraphs of fine print, an investor would find a list of TDM's paying clients; or (ii) hunt through TDM's website, where, after following a link to "Case Studies," an investor would find TDM's statement that Galectin had retained it to promote the Company's stock and "to broaden and enhance their shareholder base, as well as reach an audience of sophisticated individual and institutional investors, through a combination of dedicated list mailings, targeted content syndication, and other forms of measurable and effective outreach."  This minimal, if any, disclosure allowed Galectin to carry out its scheme to inflate the price of its stock through the use of the Stock Promoters.

**Acorn**

51.     Galectin retained Acorn to publish articles designed to boost the price of its common stock.  During the Class Period, Acorn published at least two such promotional articles about the Company.  For example, in a "Company Profile" of Galectin published on March 10,

16

2014, Acorn touted, among other things:  (i) GR-MD-02's "$1B blockbuster potential;" (ii) positive insights from investment analysts regarding the potential of the Phase I data to show signs of "clinically meaningful first-in-human anti-fibrotic activity"; and (iii) the putative parallel between Galectin and Intercept, whose market cap "saw a jump to $8.6B in just two days" after releasing data demonstrating the efficacy of its drug treatment for NASH, which was also "being targeted by GALT."

52.    Of the four known Stock Promoters the Company had retained to carry out its scheme of inflating the price of its stock, Acorn was the only one whose engagement Galectin partially revealed to investors.  The disclosure, however, only occurred after Acorn had already published the first glowing article about Galectin and was itself misleading.  Specifically, Galectin's quarterly report on Form 10-Q for the period ended March 31, 2014 ("1Q14") filed with the SEC on May 13, 2014 (the "1Q14 Form 10-Q") provided that the Company issued 3,000 shares of common stock to Acorn pursuant to a putative "consulting agreement."  Galectin disclosed its relationship with Acorn because, unlike the other Stock Promoters, Acorn received shares of Galectin's common stock as payment for its promotional work, which Galectin was obligated to report under the federal securities laws.  Nonetheless, even this disclosure omitted the fact that Galectin had engaged Acorn to promote the Company's stock.

53.    Moreover, this partial disclosure on May 13, 2014 came nearly four months after Galectin had retained Acorn and over two months after Acorn had published its extremely positive "Company Profile" of Galectin on March 10, 2014.

          ii.     **Galectin and the Hired Stock Promoters Coordinate the Timing of Their Public Statements to Coincide with the Company's ATM Offerings**

54.     With these Stock Promoters secretly retained, and as the Phase I trial of GR-MD-02 was underway with results from the first cohort of patients expected to be released in early 2014, Galectin flooded the market with one press release after another detailing every minor development of the study's progress.

55.     Then, at or near the time of the Company's various press releases, the Stock Promoters went to work and issued their own sensational and overblown articles.

56.     The Company conveniently timed its public statements regarding the Phase I study of GR-MD-02 during the same time period in which it was conducting the ATM Offerings. For example, while Galectin was selling shares of its common stock in the October 25, 2013 ATM Offering, it represented in a presentation attached to the Company's current report on Form 8-K filed with the SEC on January 13, 2014 (the "January 13, 2014 Form 8-K") that the focus of its NASH treatment program "on fibrosis, which is the key cause of liver failure in patients" distinguished the Company from its peers, including Intercept, whose treatments were aimed at "improving NASH activity score (fat, inflammation, and cell death) at a stage of the disease when there are minimal amounts of fibrosis."

57.     Moreover, just four days after Galectin announced the March 21, 2014 ATM Offering, the Company issued a press release attached to its current report on Form 8-K filed with the SEC on March 25, 2014 (the "March 25, 2014 Press Release") stating that it would release the results from the first cohort of Phase I on March 31, 2014.  While the necessity of the March 25, 2014 Press Release was questionable, its timing was certainly fortuitous, as one commentator noted:

Galectin Therapeutics (GALT) issued a press release this morning, informing

investors that results from a phase I study. . . would be announced on March 31. You might think Galectin is doing everyone a favor—a helpful reminder to mark our calendars for next week.  That's naive.  What Galectin told us today (implicitly, of course) is management has the GR-MD-02 data in hand and is already crafting a press release for next week to shine results with high gloss. ***Management's stock promotion is working.  Galectin shares are up 18% to $17.21 today.***

58.    As promised, Galectin issued a press release attached to the Company's current report on Form 8-K filed with the SEC on March 31, 2014 (the "March 31, 2014 Press Release"), which portrayed the Phase I first cohort results as a success.  Although the Company repeatedly acknowledged that the purpose of the Phase I study of GR-MD-02 was primarily to evaluate the safety and tolerability of GR-MD-02, it nevertheless routinely highlighted certain ***exploratory*** biomarkers testing for ***potential*** efficacy of GR-MD-02 as providing evidence of disease treatment when discussing these results.   For instance, the March 31, 2014 Press Release announced: "Phase I Trial Reveal Biomarker Evidence of Therapeutic Effect on Fibrosis and Inflammation in NASH."  The March 31, 2014 Press Release continued to suggest the purported efficacy of GR-MD-02 as follows:

- "in assessing secondary endpoints, it was found that multiple biomarkers of fibrosis and inflammation showed improvement after four doses of GR-MD-02;"

- "patients with greater evidence of liver cell injury…had marked decrease in CK-18, a clinically validated biomarker of cell death;"

- "we are extremely pleased with the positive results of the first cohort of our Phase 1 trial, which suggest a role for GR-MD-02 in the treatment of patients with fatty liver disease;" and

- "Preclinical data has shown that GR-MD-02 has robust treatment effects in reversing liver fibrosis and cirrhosis."

59.    Thereafter, Galectin continued to issue press releases on April 17, 2014, April 23, 2014, and May 13, 2014 that discussed the Phase I first cohort results as indicative of the drug's

19

efficacy.  For instance, in a press release attached to the Company's current report on Form 8-K filed with the SEC on April 23, 2014, Galectin represented that "the first cohort [showed] that GR-MD-02 treatment resulted in **significant improvement in multiple biomarkers** of fibrosis and liver inflammation in patients with NASH with advanced fibrosis."

60.    In turn, the Stock Promoters—at the paid behest of Galectin—manipulated and exploited Galectin's disclosures emphasizing the potential efficacy of GR-MD-02 by publishing articles that exaggerated these representations and drew misleading comparisons between Galectin and Intercept in order to artificially inflate the price of Galectin's common stock.  The Stock Promoters' articles were published conveniently and intentionally around the same general time that Galectin issued its own public statements regarding the Phase I clinical trial of GR-MD-02, which, as alleged above, coincided with Galectin's ATM Offerings.

61.    For example, elaborating on Galectin's claims of its competitiveness with Intercept in the January 13, 2014 Form 8-K, on January 28, 2014, TDM published an article stating "[i]f conclusions are to be drawn so early in the game, it's arguable that **Intercept's peer Galectin Therapeutics may actually have a better NASH/fibrosis drug in GR-MD-02**, based upon several factors."   Then, shortly after Galectin announced the March 21, 2014 ATM Offering, TDM published an article on March 27, 2014 titled "Leading Companies Being Defined in the Hunt for a NASH Treatment," which stated with respect to Galectin:

. . . .  Sadly, liver fibrosis and NASH are not reversible and often lead to the necessity for a liver transplant, of which only about 6,000 actually happen each year.

**These facts make Galectin Therapeutics particularly attractive as early research shows its lead drug candidate of GR-MD-02 to actually reverse fibrotic damage.** Although the company may trail Intercept and Galmed in stage of human trials at this point, **Galectin is only a clinical data set away from a potential leap forward with GR-MD-02.**  The drug is being developed under a "Fast Track" designation from the FDA, which provides an expedited developmental pathway as well as

other benefits.

> Galectin is in a Phase 1 trial of GR-MD-02, a complex carbohydrate drug that targets and inhibits galectin-3, a key protein in the pathogenesis of fatty liver disease. ***A critical difference in the trial protocol is that Galectin is treating patients with NASH and <u>advanced fibrosis</u>, rather than earlier stages of the disease as other biotechs are.*** Moreover, in animal models, ***GR-MD-02 was shown to not only stop liver scarring from worsening; it showed the damage to start to be repaired.*** (underlined emphasis in original).

62.   Again, as alleged above, TDM disingenuously claimed in a July 24, 2014 article published on Yahoo! Finance that Galectin was "***nipping at Intercept's heels***[,]" with "***GR-MD-02 seeming to work well even in advanced stages of liver fibrosis***[,]" and "***showing changes in key biomarkers, which suggests a therapeutic effect on fibrosis***[,]" rendering the anticipated release of its second cohort results "***potentially a catalytic moment for the company's value***."

63.   Not coincidentally, Galectin issued a press release the very next day (the "July 25, 2014 Press Release") announcing that it would be presenting the results from the second cohort of its Phase I study of GR-MD-02 on July 29, 2014.

64.   In addition to TDM, Cox also published twenty-three (23) articles through his *Transformational Technology Alert* newsletter on Defendant Mauldin's website, Mauldin Economics, that touted Galectin during the Class Period. Cox's articles similarly exaggerated the putative efficacy of GR-MD-02 and Galectin's competitiveness with Intercept. For example, on April 3, 2014, Cox wrote with respect to the results from the first cohort of Galectin's Phase I study of GR-MD-02:

> Markers of inflammation and fibrosis in the six patients suffering fatty liver disease ***improved across the board.*** More importantly, the two patients suffering from the most advanced form of NASH, with associated liver cell death due to fibrosis and inflammation, ***showed significant reductions in the markers that indicate apoptosis or cell death.*** This, in one hyphenated word, is ***world-changing.*** It means that the drug, even at low doses that proved safe in this study, reduced the markers of disease progression in earlier stages of the disease. In advanced patients, we saw indications that cellular damage was significantly

21

ameliorated.  This means the drug is ***disease-modifying.  It didn't only prevent worsening.  It improved the patients' condition.***

65.     Likewise, Acorn also analogized Galectin to Intercept when it published a "Company Profile" of Galectin on March 10, 2014, in which it provided an analysis of GR-MD-02 and investment analysts' opinions of the Company's securities.  After discussing the results from the first cohort of Galectin's Phase I study and the efficacy of GR-MD-02, Acorn stated, "Intercept Pharmaceuticals (ICPT)—a company with a market cap worth $1.4B on 01/09/2014, saw a jump to $8.6B in two days.  On NASH efficacy data for NASH—an incurable and very common liver condition being targeted by GALT."

66.     Also, on February 10, 2014, The Dream Team released an article on its MissionIR website titled "Investors Should Consider Galectin Therapeutics (GALT)."  Among other facts, The Dream Team emphasized that "***GR-MD-02 demonstrated that it proved NASH activity significantly.  Not only was this good news, but it also reduced fibrosis preventing/reducing the accumulation of collagen [sic] in the liver.  There was also a reduction in galectin-3 and other inflammatory biomarkers.***"  Based upon this data and other purportedly key developments in the GR-MD-02 clinical trial, The Dream Team positively concluded that "***[i]f the company continue[s] on its current pace, investors are likely looking at a long-term winner in Galectin Therapeutics***."

67.     Between the time Galectin announced its submission of an IND application to conduct the Phase I study of GR-MD-02 in January 2013 and the time that it issued the July 25, 2015 Press Release, the price of Galectin's common stock increased from roughly $2 per share to as high as $19 per share.  Capitalizing on the artificially inflated price of its common stock during this period, Galectin conducted the two ATM Offerings.

### D.     Defendants Misrepresent That They Do Not Manipulate the Price of Shares Being Sold in the ATM Offerings

68.     Despite the Company's extensive and (for the most part) undisclosed use of the Stock Promoters, Galectin represented during the Class Period that it did not engage in any conduct to manipulate the Company's stock price.

69.     Specifically, the At-Market Agreements stated in pertinent part:

> Neither the Company, nor any Subsidiary, nor any of their respective directors, officers or controlling persons has taken, directly or indirectly, any action designed, or that has constituted or would reasonably be expected to cause or result in, under the Exchange Act or otherwise, the stabilization or **manipulation** of the price of any security of the Company to facilitate the sale or resale of the Placement Shares.
>
> *   *   *
>
> The Company will not, directly or indirectly, (i) take any action designed to cause or result in, or that constitutes or would reasonably be expected to constitute, the stabilization or **manipulation** of the price of any security of the Company to facilitate the sale or resale of Common Stock or (ii) sell, bid for, or purchase Common Stock in violation of Regulation M, or pay anyone any compensation for soliciting purchases of the Placement Shares other than MLV.

70.     In addition, the Company made repeated representations in its public SEC filings regarding the proceeds that it had generated to date from the ATM Offerings.  For example, the Company's annual report on Form 10-K filed with the SEC on March 21, 2014 (the "2013 Form 10-K") disclosed in relevant part:

> On October 25, 2013, the Company entered into an At Market Issuance Sales Agreement (the "At Market Agreement") with a sales agent under which the Company may issue and sell shares of its common stock having an aggregate offering price of up to $30.0 million from time to time through the sales agent. Sales of the Company's common stock through the sales agent, if any, will be made by any method that is deemed an "at the market" offering as defined by the U.S. Securities and Exchange Commission.  The Company will pay to the sales agent a commission rate equal to 3.0% of the gross proceeds from the sale of any shares of common stock sold through the sales agent under the At Market Agreement.  As of December 31, 2013, the Company had issued 99,942 shares of its common stock through its At Market issuance program at an average price of $9.02 per share resulting in gross proceeds of approximately $944,000.  The Company incurred one time, initial legal and accounting costs of approximately

$82,000 and commissions of $29,000 resulting in net proceeds of $833,000 as of December 31, 2013.   In January and February 2014, the Company issued 2,663,647 shares of common stock for net proceeds of approximately $28,178,000 which completed the At Market Agreement.

71.     These statements were blatantly misleading and deceptively concealed the fact that the Company had paid the Stock Promoters to publish articles designed to artificially inflate the price of its common stock during the same time period in which the Company was selling such stock in its ATM Offerings.

**E.       The Truth Is Revealed**

72.     On July 25, 2014, Adam Feuerstein, an investment commentator for *TheStreet* initially alerted the market to Galectin's fraudulent stock promotion scheme when he tweeted on Twitter: "$GALT paying penny stock promoters to issue misleading PRs posted to Y!"

73.     Then, on July 28, 2014, Bleecker Street Research posted an article on the website *Seeking Alpha* titled "Galectin Therapeutics: Why This Penny Stock Dressed Up By Stock Promoters Is A Short."   Confirming Feuerstein's tweet, the Bleecker Street Research Article stunningly revealed, among other facts, that Galectin "has strong ties to multiple stock promoters."

74.     In particular, the Bleecker Street Research Article discussed Galectin's ties to TDM and Cox—both of whom the Company had paid to launch promotional campaigns aimed at increasing the price of Galectin's common stock—as follows:

> From the time of the name change up until TDM Financial began getting paid to promote the stock, GALT was a sub $5 stock that traded sparsely.  The promotion worked, as ***GALT's stock has nearly tripled since TDM Financial began targeting retail investors and retirees.  Since the promotion began GALT has used the strength in its stock to do a $100 million offering*** which included a 500,000 share sell from Richard Uhilein.

> \* \* \*

> Having connections to one stock promoter is bad enough, but ***GALT has ties to***

24

> *another stock promoter.  This time the stock promoter is Patrick Cox*, who also promoted PVCT right before the stock plunged 90%.  Patrick Cox has promoted numerous biotechs, here is an interview in which he touts several biotechs including GALT.   As BuyersStrike points out, *Patrick Cox has colorful background*. . . .  *This is Patrick Cox calling GALT a company that will "change the world."*

75.      Elaborating on his earlier tweet, on July 28, 2014, Feuerstein posted an article on *TheStreet* titled "Galectin Pays Stock Promoters to Entice Retail Investors."  The July 28, 2014 Feuerstein Article shed additional light on Galectin's deceptive scheme, as it exposed the gross inaccuracies of the Stock Promoters' repeated representations touting putative evidence of GR-MD-02's efficacy and analogizing Galectin to the industry leader, Intercept:

> *Only someone being paid to shill would claim Galectin is "nipping at Intercept's heels."*  Intercept is way ahead in developing a drug to treats non-alcoholic steatohepatitis (NASH), a severe form of fatty liver disease, and its clinical studies to date have been designed using appropriate endpoints.  Galectin, by comparison, is conducting a phase I "safety" study of its NASH candidate enrolling a tiny number of patients and using endpoints which collect useless biomarker data. *It's as if Galectin doesn't really want to find out if their drug is effective against NASH.*

76.      The July 28, 2014 Feuerstein Article further revealed Galectin's routine practice of issuing its own press releases in conjunction with the Stock Promoters' misleading articles in a patent attempt to attract the attention of investors and accordingly increase the price of its common stock being sold in the ATM Offerings:

> After [TDM]'s misleading press release was issued Thursday, Galectin followed up with a press release of its own on Friday to announce a conference call for Tuesday morning.  The subject of the call: To discuss updated results from its phase I NASH study. You think the two press releases might have been coordinated?  Galectin pulled the same stunt in March, which helped the company sell stock through an At-The-Market (ATM) equity sales agreement.

77.      The revelation of Defendants' stock promotion scheme on July 28, 2014 caused Galectin's stock price to collapse both before the markets closed that day and in after-hours trading, dropping $8.81 per share, or *more than 55%*, from its opening price of $15.91 per share

on July 28, 2014, to open at $7.10 per share on July 29, 2014.

## VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.  The Company's Press Releases and SEC Filings Were Materially False and Misleading

#### i.  October 25, 2013 ATM Offering

78.     On October 25, 2013, Galectin filed the October 25, 2013 Form 8-K, which was signed by Defendant Callicutt, announcing that it had entered into the At-Market Agreement with MLV.  In accordance with the terms of the At-Market Agreement, which was signed by Defendant Traber and filed with the SEC as an exhibit to the October 25, 2013 Form 8-K, Galectin was authorized to offer and sell shares of its common stock having an aggregate price of up to $30.0 million from time to time through MLV, acting as its sales agent, under the Company's October 25, 2013 Prospectus Supplement and the March 16, 2011 Registration Statement, by any method deemed an ATM offering, as defined in Rule 415 under the Securities Act.

79.     In the At-Market Agreement, Defendants represented in pertinent part as follows:

> *Neither the Company, nor any Subsidiary, nor any of their respective directors, officers or controlling persons has taken, directly or indirectly, any action designed, or that has constituted or would reasonably be expected to cause or result in, under the Exchange Act or otherwise, the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Placement Shares*.

Defendants further pledged in the At-Market Agreement that "*[t]he Company will not, directly or indirectly, (i) take any action designed to cause or result in, or that constitutes or would reasonably be expected to constitute, the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of Common Stock*. . . ."

80.     The foregoing statements in ¶ 79 were materially false and misleading when made because Defendants knew but failed to disclose that the Company had hired the Stock Promoters

to publish highly exaggerated and manipulative articles touting Galectin's common stock to investors by, *inter alia*:   (i) embellishing the putative effectiveness of GR-MD-02 in the treatment of patients with NASH despite the absence of any definitive evidence proving its efficacy; and (ii) overstating Galectin's competitiveness with its so-called "peer" Intercept, even though Intercept's clinical trial was ***more than two years ahead*** of Galectin's and ***had already delivered positive Phase II data demonstrating the efficacy of its drug candidate***.   Thus, contrary to Defendants' assurances in the At-Market Agreement, Galectin had engaged in conduct designed to manipulate the price of its securities in order to generate capital with as little dilution as possible from the sale of its common stock in the October 25, 2013 ATM Offering.

### ii.   3Q13 Form 10-Q

81.   On November 12, 2013, Galectin filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2013 ("3Q13") (the "3Q13 Form 10-Q"), which was signed by Defendants Callicutt and Traber, and attached certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act ("SOX") that were also signed by Defendants Callicutt and Traber.   The 3Q13 Form 10-Q disclosed as follows with respect to the proceeds generated to date from the October 25, 2013 ATM Offering:

> On October 25, 2013, the Company entered into an At Market Issuance Sales Agreement (the "At Market Agreement") with a sales agent under which the Company may issue and sell shares of its common stock having an aggregate offering price of up to $30.0 million from time to time through the sales agent. Sales of the Company's common stock through the sales agent, if any, will be made by any method that is deemed an "at the market" offering as defined by the U.S. Securities and Exchange Commission.   The Company will pay to the sales agent a commission rate equal to 3.0% of the gross proceeds from the sale of any shares of common stock sold through the sales agent under the At Market Agreement.   Subsequent to September 30, 2013, the Company had issued 50,643 shares of its common stock through its At Market issuance program at an average price of $10.82 per share resulting in net proceeds of approximately $531,000.

82.     The foregoing statements in ¶ 81 were materially false and misleading when made because Defendants knew but failed to disclose that Galectin had raised the above funds by secretly hiring the Stock Promoters to publish highly exaggerated and manipulative articles touting Galectin's common stock to investors by, *inter alia*:  (i) embellishing the putative effectiveness of GR-MD-02 in the treatment of patients with NASH despite the absence of any definitive evidence proving its efficacy; and (ii) overstating Galectin's competitiveness with its so-called "peer" Intercept, even though Intercept's clinical trial was *more than two years ahead* of Galectin's and *had already delivered positive Phase II data demonstrating the efficacy of its drug candidate*.

### iii.     January 10, 2014 Press Release

83.     On January 10, 2014, Galectin filed with the SEC a current report on Form 8-K, which was signed by Defendant Callicutt and attached the January 10, 2014 Press Release.  The January 10, 2014 Press Release announced the total proceeds that Galectin had generated to date from the October 25, 2013 ATM Offering as follows:

> Galectin Therapeutics Inc. (NASDAQ: GALT), the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, today announced that it had sold, from October 28, 2013 through January 9, 2014, a total of 2,391,204 shares of common stock at an average price per share of $9.99 for total gross proceeds of $23,883,137 through its at-the-market (ATM) financing vehicle.  The Company entered into an ATM financing arrangement with MLV & Co. LLC ("MLV") in October 2013, which provides it the opportunity to sell up to $30 million in registered shares into the open market through MLV from time-to-time under its effective shelf registration.  After commissions, the Company received $23,164,712 in net proceeds.  The intended use of the net proceeds is to finance the Company's planned Phase 2 program for GR-MD-02 after completion of the Phase 1 clinical trial and for general corporate purposes.  The Company currently has approximately $32.3 million in cash, and there are approximately 20.7 million shares of our common stock outstanding.

84.     The foregoing statements in ¶ 83 were materially false and misleading when made because Defendants knew but failed to disclose that Galectin had raised the above funds by

secretly hiring the Stock Promoters to publish highly exaggerated and manipulative articles touting Galectin's common stock to investors by, *inter alia*:  (i) embellishing the putative effectiveness of GR-MD-02 in the treatment of patients with NASH despite the absence of any definitive evidence proving its efficacy; and (ii) overstating Galectin's competitiveness with its so-called "peer" Intercept, even though Intercept's clinical trial was ***more than two years ahead*** of Galectin's and ***had already delivered positive Phase II data demonstrating the efficacy of its drug candidate***.

### iv.    2013 Form 10-K

85.    On March 21, 2014, Galectin filed its 2013 Form 10-K, which was signed by the Individual Defendants, and attached certifications pursuant to SOX Sections 302 and 906 that were signed by Defendants Callicutt and Traber.  The 2013 Form 10-K disclosed as follows with respect to the proceeds generated to date from the October 25, 2013 ATM Offering:

> On October 25, 2013, the Company entered into an At Market Issuance Sales Agreement (the "At Market Agreement") with a sales agent under which the Company may issue and sell shares of its common stock having an aggregate offering price of up to $30.0 million from time to time through the sales agent. Sales of the Company's common stock through the sales agent, if any, will be made by any method that is deemed an "at the market" offering as defined by the U.S. Securities and Exchange Commission.  The Company will pay to the sales agent a commission rate equal to 3.0% of the gross proceeds from the sale of any shares of common stock sold through the sales agent under the At Market Agreement.  As of December 31, 2013, the Company had issued 99,942 shares of its common stock through its At Market issuance program at an average price of $9.02 per share resulting in gross proceeds of approximately $944,000.  The Company incurred one time, initial legal and accounting costs of approximately $82,000 and commissions of $29,000 resulting in net proceeds of $833,000 as of December 31, 2013.  In January and February 2014, the Company issued 2,663,647 shares of common stock for net proceeds of approximately $28,178,000 which completed the At Market Agreement.

86.    The foregoing statements in ¶ 85 were materially false and misleading when made because Defendants knew but failed to disclose that Galectin had raised the above funds by secretly hiring the Stock Promoters to publish highly exaggerated and manipulative articles

touting Galectin's common stock to investors by, *inter alia*:  (i) embellishing the putative effectiveness of GR-MD-02 in the treatment of patients with NASH despite the absence of any definitive evidence proving its efficacy; and (ii) overstating Galectin's competitiveness with its so-called "peer" Intercept, even though Intercept's clinical trial was ***more than two years ahead*** of Galectin's and ***had already delivered positive Phase II data demonstrating the efficacy of its drug candidate***.

### v.      March 21, 2014 ATM Offering

87.      On March 21, 2014, Galectin filed the March 21, 2014 Registration Statement, which was signed by the Individual Defendants, announcing that, *inter alia*, the Company and MLV had amended the At-Market Agreement.  In accordance with the terms of the At-Market Agreement, as amended, which was signed by Defendant Traber and filed with the SEC as an exhibit to the March 21, 2014 Registration Statement, Galectin was authorized to offer and sell shares of its common stock having an aggregate price of up to $30 million from time to time through MLV, acting as its sales agent, under the Sales Agreement Prospectus, by any method deemed an "at the market" offering, as defined in Rule 415 under the Securities Act.

88.      The At-Market Agreement, as amended, incorporated by reference the statements in the At-Market Agreement that are set forth above in ¶ 79.

89.      The foregoing statements in ¶¶ 79 and 88 were materially false and misleading when made because Defendants knew but failed to disclose that the Company had hired the Stock Promoters to publish highly exaggerated and manipulative articles touting Galectin's common stock to investors by, *inter alia*:  (i) embellishing the putative effectiveness of GR-MD-02 in the treatment of patients with NASH despite the absence of any definitive evidence proving its efficacy; and (ii) overstating Galectin's competitiveness with its so-called "peer" Intercept, even though Intercept's clinical trial was ***more than two years ahead*** of Galectin's and ***had***

*already delivered positive Phase II data demonstrating the efficacy of its drug candidate*.

Thus, contrary to Defendants' assurances in the At-Market Agreement, as amended, Galectin had

engaged in conduct designed to manipulate the price of its securities in order to generate capital

with as little dilution as possible from the sale of its common stock in the March 21, 2014 ATM

Offering.

### vi.    1Q14 Form 10-Q

90.    On May 13, 2014, Galectin filed with the SEC the 1Q14 Form 10-Q, which was

signed by Defendants Callicutt and Traber, and attached certifications pursuant to SOX Sections

302 and 906 that were also signed by Defendants Callicutt and Traber.  The 1Q14 Form 10-Q

disclosed as follows with respect to the proceeds generated to date from the October 25, 2013

ATM Offering:

> On October 25, 2013, the Company entered into an At Market Issuance Sales
> Agreement (the "At Market Agreement") with a sales agent under which the
> Company may issue and sell shares of its common stock having an aggregate
> offering price of up to $30.0 million from time to time through the sales agent.
> Sales of the Company's common stock through the sales agent, if any, will be
> made by any method that is deemed an "at the market" offering as defined by the
> U.S. Securities and Exchange Commission.  The Company will pay to the sales
> agent a commission rate equal to 3.0% of the gross proceeds from the sale of any
> shares of common stock sold through the sales agent under the At Market
> Agreement.  As of December 31, 2013, the Company had issued 99,942 shares of
> its common stock through its At Market issuance program at an average price of
> $9.02 per share resulting in gross proceeds of approximately $944,000. The
> Company incurred one time, initial legal and accounting costs of approximately
> $82,000 and commissions of $29,000 resulting in net proceeds of $833,000 as of
> December 31, 2013.  In January and February 2014, the Company issued
> 2,663,647 shares of common stock for net proceeds of approximately $28,178,000
> which completed the At Market Agreement.

91.    The foregoing statements in ¶ 90 were materially false and misleading when made

because Defendants knew but failed to disclose that the Company had raised the above funds by

secretly hiring the Stock Promoters to publish highly exaggerated and manipulative articles

touting Galectin's common stock to investors by, *inter alia*:   (i) embellishing the putative

effectiveness of GR-MD-02 in the treatment of patients with NASH despite the absence of any definitive evidence proving its efficacy; and (ii) overstating Galectin's competitiveness with its so-called "peer" Intercept, even though Intercept's clinical trial was ***more than two years ahead*** of Galectin's and ***had already delivered positive Phase II data demonstrating the efficacy of its drug candidate***.

### B.    The Stock Promoters' Articles Omitted Material Facts

#### i.    The Dream Team

92.    Defendants, acting through their agent, The Dream Team, issued the following promotional article touting Galectin to investors during the Class Period:

> 1)    "Investors Should Consider Galectin Therapeutics (GALT)," MissionIR (February 10, 2014).

93.    Defendants knew and/or recklessly disregarded that the foregoing article in ¶ 92 was materially false and misleading when issued, because it failed to disclose that the Company had paid The Dream Team to tout Galectin's current performance and future prospects.

#### ii.    Cox

94.    Defendants, acting through their agent, Cox, issued the following promotional articles touting Galectin to investors during the Class Period:

> 1)    "DNA that Fights Crime and Creates Fortunes," *Transformational Technology Alert* (Issue 1.03, November 2013);
>
> 2)    "Buy Galectin Therapeutics (Nasdaq:GALT) on the Dip," *Transformational Technology Alert* (November 6, 2013);
>
> 3)    "Inovio CEO Opens Up Regarding Rejuvenating DNA Vaccine," *Transformational Technology Alert* (November 7, 2013);
>
> 4)    "On Old and New Media, Ignorance, Malevolence and Transformational Biotech," *Transformational Technology Alert* (November 21, 2013);
>
> 5)    "BioTime Shows 23andMe How It's Done," *Transformational Technology Alert* (December 19, 2013);

6)      "Room-Temperature Ambient-Pressure Nanotechnologies Change the Solar Game," *Transformational Technology Alert* (Issue 1.04, January 2014);

7)      "How to Play the Superbug Hysteria to Make Super Profits," *Transformational Technology Alert* (Issue 1.05, January 2014);

8)      "Galectin Therapeutics Moves as Liver Drugs Gain Spotlight," *Transformational Technology Alert* (January 16, 2014);

9)      "Galectin Therapeutics Jumps on Study Results, Patent Approval," *Transformational Technology Alert* (January 22, 2014);

10)     "Screaming Toward the Biotech Singularity: BioTime," Galectin Therapeutics, and More," *Transformational Technology Alert* (January 30, 2014);

11)     "Shark Steroid Offers Hope for Combating Macular Degeneration (and for Enormous Profits)," *Transformational Technology Alert* (Issue 1.06, February 2014);

12)     "What Does the IND Phase 1B Trial for Galectin Therapeutics Really Mean?," *Transformational Technology Alert* (February 6, 2014);

13)     "Technology to Help You Clean Up in the Fracking Boom," *Transformational Technology Alert* (Issue 1.07, March 2014);

14)     "What Penicillin Can Teach Us About Transformational Biotech," *Transformational Technology Alert* (March 13, 2014);

15)     "Regenerative Medicine Promotion Act of 2014 Introduced," *Transformational Technology Alert* (March 20, 2014);

16)     "Delivering Superior Profits Through Superior Delivery Technology," *Transformational Technology Alert* (Issue 1.08, April 2014);

17)     "Two World-Changing Presentations You Must Watch," *Transformational Technology Alert* (April 3, 2014);

18)      "A Note on the Broad Biotechnology Selloff," *Transformational Technology Alert* (April 17, 2014);

19)     "The Body's Own Antibiotic Acid Could Lower Medical Costs and Generate Huge Profits," *Transformational Technology Alert* (Issue 1.09, May 2014);

20)     "BioTime and Inovio Announce Major Developments," *Transformational Technology Alert* (May 29, 2014);

21)     "Nanocage Smart-Bomb Drugs Could Deliver Explosive Gains," *Transformational Technology Alert* (Issue 1.10, June 2014);

22)     "Galectin Therapeutics Announces Preclinical Oral Efficacy," *Transformational Technology Alert* (June 25, 2014);

23) "Winning the War on Alzheimer's," *Transformational Technology Alert* (Issue 1.11, July 2014).

95.     Defendants knew and/or recklessly disregarded that the foregoing articles in ¶ 94 were each materially false and misleading when issued because they failed to disclose that the Company had paid Cox to tout Galectin's current performance and future prospects.

### iii.    TDM

96.     Defendants, acting through their agent, TDM, issued the following promotional articles touting Galectin to investors during the Class Period:

1) "Pharmaceutical Stocks Outperform The S&P 500 By 20% YTD," SECFilings.com (November 4, 2013);

2) "Obesity Stock Plays Standing Out From The Crowd," SECFilings.com (December 17, 2013);

3) "Aegis Raises Price Target On Galectin As Intercept Raises Bar For Value Of Fibrosis Drugs," SECFilings.com (January 28, 2014);

4) "Galectin Therapeutics Leaps Ahead With SBH Sciences Partnership," SECFilings.com (February 13, 2014);

5) "Leading Companies Being Defined In The Hunt For A NASH Treatment," SECFilings.com (March 27, 2014);

6) "Galectin, Intercept, Others Vying For Lead Drugs In NASH Epidemic," Emerging Growth LLC (July 24, 2014).

97.     Defendants knew and/or recklessly disregarded that the foregoing articles in ¶ 96 were each materially false and misleading when issued because they failed to disclose that the Company had paid TDM to tout Galectin's current performance and future prospects.

### iv.    Acorn

98.      Defendants, acting through their agent, Acorn, issued the following promotional materials touting Galectin to investors during the Class Period:

1) "Galectin Therapeutics: Company Profile," Acorn Management Partners, LLC (March 10, 2014);

2) "AMP Quick Facts:  Galectin Therapeutics (Nasdaq: GALT)," Acorn Management Partners, LLC (June 23, 2014).

99.     Defendants knew and/or recklessly disregarded that the foregoing materials in ¶ 98 were each materially false and misleading when issued because they failed to disclose that the Company had paid Acorn to tout Galectin's current performance and future prospects.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

100.    As alleged above, Defendants Galectin and the Individual Defendants acted with scienter in that they:  (i) knew or recklessly disregarded that the statements identified above in ¶¶ 79, 81, 83, 85, 88, 90, 92, 94, 96, and 98 were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents; and/or (iv) knowingly or recklessly engaged in the fraudulent scheme alleged herein as primary violators of the federal securities laws. Defendants Galectin and the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Galectin's hidden stock promotion scheme, and their control over, and receipt or modification of Galectin's materially false and misleading statements, actively participated in the fraudulent scheme alleged herein.

101.    ***First***, the Individual Defendants, as Galectin's executive officers and/or directors, controlled the contents of the Company's public SEC filings during the Class Period.  Each was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance.  By virtue of their respective positions and access to material non-public information regarding the Company, each knew or recklessly disregarded that the adverse facts alleged herein concerning the Company's retention of the Stock Promoters to artificially inflate the price of Galectin's common stock had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and

incomplete.   As a result, the Individual Defendants were responsible for the accuracy of Galectin's public SEC filings, and were therefore responsible and liable for the representations contained therein or omitted therefrom.

102.   Indeed, as alleged herein, throughout the Class Period, Defendant Traber served as the Company's CEO, President, and CMO.  In these capacities, Defendant Traber signed the At-Market Agreements, the 3Q13 Form 10-Q, the 2013 Form 10-K, the March 21, 2014 Registration Statement, and the 1Q14 Form 10-Q, each of which contained the materially false and misleading statements alleged herein, as set forth above in ¶¶ 78, 81, 83, 85, 87, 89.   In addition, as alleged herein, throughout the Class Period, Defendant Callicutt served as the Company's CFO.  In this capacity, Defendant Callicutt signed the October 25, 2013 Form 8-K, the 3Q13 Form 10-Q, the January 10, 2014 Press Release, the 2013 Form 10-K, the March 21, 2014 Registration Statement, and the 1Q14 Form 10-Q, each of which contained the materially false and misleading statements alleged herein, as set forth above in ¶¶ 78, 81, 83, 85, 87, 90. Finally, as alleged herein, throughout the Class Period, Defendants Czirr, Martin, and Mauldin served as directors of the Board.  In this capacity, they each signed the 2013 Form 10-K and the March 21, 2014 Registration Statement, each of which contained the materially false and misleading statements alleged herein, as set forth above in ¶¶ 85, 87.

103.   Further, for each of Galectin's quarterly and annual reports on Forms 10-Q and 10-K that were filed with the SEC during the Class Period, Defendants Callicutt and Traber separately executed certifications pursuant to SOX Section 302 attesting to the Company's disclosure controls and procedures in pertinent part as follows:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:
>
> a)      Designed such disclosure controls and procedures, or caused such

disclosure controls and procedures to be designed under our supervision to ensure that *material information* relating to the registrant, including its consolidated subsidiaries, *is made known to us* by others within those entities, particularly during the period in which this report is being prepared.

104.    *Second*, Galectin and the Individual Defendants were financially motivated to conceal the Company's retention of the Stock Promoters.  With no source of revenue, Galectin's successful development of GR-MD-02 and its continued existence were contingent upon raising capital to finance the GR-MD-02 clinical trial.  To this end, the Company conducted the ATM Offerings.  Because the price at which Galectin was authorized to sell shares of its common stock in each of these offerings was based upon the market price of such shares, Galectin and the Individual Defendants had a clear incentive to artificially inflate this price so that the Company could generate maximum proceeds from each of these offerings and minimize any potential dilution to their holdings.

105.    *Third*, the fact that Galectin's undisclosed stock promotion scheme directly involved Galectin's core business operations—the GR-MD-02 clinical trial—further supports a strong inference that Galectin and the Individual Defendants acted with scienter.  Indeed, the Company expressly acknowledged in its public SEC filings that it was "largely dependent" on the development of its lead product candidate, GR-MD-02.  Because the promotional articles alleged herein specifically touted the putative success of the GR-MD-02 clinical trial for the purpose of enabling the Company to finance the same through the sale of its common stock at artificially inflated prices in the October 25, 2013 and March 21, 2014 ATM Offerings, Galectin and the Individual Defendants knowingly and/or recklessly issued the materially false and misleading statements alleged herein.

## VIII.   LOSS CAUSATION

106.    The material misstatements and omissions detailed above had the cause and effect of creating unrealistically positive assessments of Galectin and its business, prospects, and operations in the market, which caused the Company's common stock to be overvalued and artificially inflated throughout the Class Period.   Lead Plaintiff and other Class members purchased or otherwise acquired Galectin common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein.

107.    Defendants' materially false and misleading statements and omissions alleged herein directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.   During the Class Period, Defendants publicly issued materially false and misleading statements and omissions of material fact concerning the At-Market Agreements underlying and the proceeds generated from Galectin's ATM Offerings because they:  (i) misrepresented that the Company abstained from taking actions that manipulated the price of its common stock; and/or (ii) failed to disclose Galectin's engagement of the Stock Promoters to artificially inflate the price of Galectin common stock by flooding the market with unsubstantiated, sensationalized articles purporting to truthfully report the efficacy of GR-MD-02 and the imminent, burgeoning success of the Company.   In addition, the articles published by the Stock Promoters as agents of the Company were false and misleading for failing to disclose that the Stock Promoters were paid by the Company to publish the articles.  Had Defendants been truthful about these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their shares of Galectin common stock at the artificially inflated prices at which they were offered.

108.    As a direct result of Defendants' misrepresentations and omissions of material fact, the price of Galectin's common stock was artificially inflated throughout the Class Period.

This artificial inflation was removed from the price of Galectin's common stock when the truth about Galectin's misrepresentations was finally revealed, causing investors' losses.  The timing and magnitude of Galectin's common stock price decline negates any inference that the losses suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to the Defendants' fraudulent conduct.

109.    Specifically, on July 28, 2014, the Bleecker Street Research Article disclosed that Galectin had ties to several of the Stock Promoters—including TDM and Cox, as alleged above in ¶¶ 73-74.

110.    That same day, the July 28, 2014 Feuerstein Article also reported that Galectin had engaged the Stock Promoters to artificially boost the share price of Galectin's common stock in order to raise capital through the ATM Offerings, as alleged above in ¶¶ 75-76.  In direct response to these disclosures of the true facts misrepresented and concealed by Defendants' materially false and misleading statements and omissions, the price of Galectin's common stock plunged by $8.81 per share, or more than 55%, from an opening price of $15.91 per share on July 28, 2014, to $7.10 per share when the markets opened on July 29, 2014.

## IX.    LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

111.    At all relevant times, the market for Galectin's common stock was an open and efficient market for the following reasons, among others:

   a)    Galectin's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient electronic stock market;

   b)    As a registered and regulated issuer of securities, Galectin filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c)   Galectin regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)   Galectin was followed by securities analysts who wrote reports that were publicly available and entered the public marketplace; and

e)   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Galectin stock.

112.   As a result of the foregoing, the market for Galectin common stock promptly digested current information regarding Galectin from all publicly available sources, and the prices of Galectin common stock reflected such information.  Based upon the materially false and misleading statements and omissions of material fact alleged herein, Galectin common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and the other members of the Class purchased Galectin common stock relying upon the integrity of the market price of Galectin common stock and other market information relating to Galectin.

113.   Under these circumstances, all purchasers of Galectin common stock during the Class Period suffered similar injuries through their purchases of Galectin common stock at artificially inflated prices, and a presumption of reliance applies.

114.   Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information, as required by law and in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Galectin common stock at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Lead Plaintiff and the other members are entitled to a presumption of reliance

in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972) ("*Affiliated Ute*").

## X.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

115.   The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

116.   None of the statements alleged herein was a forward-looking statement, nor were they identified as "forward-looking statements" when made.   Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

117.   To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

118.   Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Galectin who knew that those statements were false when made.

41

## XI.    CLASS ACTION ALLEGATIONS

119.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and all those who purchased Galectin common stock during the Class Period.  Excluded from the Class are Defendants, members of Defendants' immediate families, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

120.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  At the end of the Class Period, approximately 22.0 million shares of Galectin common stock were outstanding and actively traded on the NASDAQ.  The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Galectin or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

121.    Lead Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

122.    Lead Plaintiff's claims are typical of the claims of all other members of the Class because Lead Plaintiff's and all of the other Class members' damages arise from, and were caused by, the same false and misleading representations and omissions made by, or chargeable

to, Defendants.  Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

123.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged herein.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

124.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to members of the Class are:

a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)   whether Defendants' statements issued during the Class Period were materially false and misleading;

c)   whether and to what extent the market price of Galectin's common stock was artificially inflated and/or distorted during the Class Period due to the misrepresentations and/or omissions of material fact complained of herein;

d)   whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter; and

e)   the extent of injuries sustained by members of the Class and the appropriate measure of damages.

**XII.   CAUSES OF ACTION**

<u>COUNT I</u>

<u>For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated
Thereunder Against Defendants Galectin, Callicutt, and Traber</u>

125.    Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is asserted against Defendants Galectin, Callicutt, and Traber (collectively, the "Rule 10b-5(b) Defendants").

126.    During the Class Period, the Rule 10b-5(b) Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Galectin common stock; and (iii) cause Lead Plaintiff and the other members of the Class to purchase shares of Galectin common stock at artificially inflated prices that did not reflect their true value. In furtherance of their unlawful scheme, plan, and course of conduct, the Rule 10b-5(b) Defendants took the actions set forth herein.

127.    While in possession of material adverse, non-public information, the Rule 10b-5(b) Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges, made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading in an effort to maintain artificially high market prices for Galectin common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  The Rule 10b-5(b) Defendants are

sued as primary participants in the dissemination of the material misrepresentations and omissions alleged herein.

128.    By virtue of their high-level positions at the Company during the Class Period, Defendants Callicutt and Traber were authorized to make public statements, and made public statements during the Class Period on Galectin's behalf.  Defendants Callicutt and Traber were privy to and participated in the creation, development, and issuance of the materially false and misleading statements and omissions alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

129.    In addition to the duties of full disclosure imposed on the Rule 10b-5(b) Defendants as a result of their making of affirmative statements and reports to the investing public, the Rule 10b-5(b) Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01 et seq.) and Regulation S-K (17 C.F.R. Section 229.10 et seq.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. Defendants Callicutt and Traber also had duties under SOX to ensure that Galectin's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

130.    The Rule 10b-5(b) Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and to disclose such facts, even though such facts were known or readily available to them.  The Rule 10b-5(b) Defendants' material misrepresentations and omissions were done knowingly

and/or recklessly, and had the effect of concealing the truth with respect to Galectin's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

131.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Galectin's common stock during the Class Period.  In ignorance of the fact that the market prices of Galectin's common stock were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by the Rule 10b-5(b) Defendants, and upon the integrity of the market in which the Company's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by the Rule 10b-5(b) Defendants but not disclosed in public statements by the Rule 10b-5(b) Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Galectin's common stock during the Class Period at artificially inflated prices.  As the truth eventually emerged, the price of Galectin's common stock substantially declined.

132.    At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth with respect to the business, operations, performance, and prospects of Galectin, which was concealed by the Rule 10b-5(b) Defendants, Lead Plaintiff and the other members of the Class would not have purchased Galectin's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

133.    By virtue of the foregoing, the Rule 10b-5(b) Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

134.    As a direct and proximate result of the Rule 10b-5(b) Defendants' materially false and misleading statements and omissions of material fact, Lead Plaintiff and the other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Against Galectin and the Individual Defendants

135.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Galectin and the Individual Defendants (collectively, the "Rule 10b-5(a) and (c) Defendants").

136.    During the Class Period, the Rule 10b-5(a) and (c) Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges to participate in the undisclosed stock promotion scheme alleged herein in order to:  (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Galectin common stock; and (iii) cause Lead Plaintiff and the other members of the Class to purchase shares of Galectin common stock at artificially inflated prices that did not reflect their true value.  In furtherance of their unlawful scheme, plan, and course of conduct, the Rule 10b-5(a) and (c) Defendants took the actions set forth herein.

137.    While in possession of material adverse, non-public information, the Rule 10b-5(a) and (c) Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges:  (i) employed devices schemes, and artifices to defraud; and/or (ii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff

and the other Class members in an effort to maintain artificially high market prices for Galectin common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.  The Rule 10b-5(a) and (c) Defendants are sued as primary participants in the fraudulent scheme alleged herein.

138.    The Rule 10b-5(a) and (c) Defendants' misconduct was engaged in knowingly and/or recklessly, and had the effect of concealing the truth with respect to Galectin's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

139.    The stock promotion scheme alleged herein artificially inflated the market price of Galectin's common stock during the Class Period.  In ignorance of the fact that the market prices of Galectin's common stock were artificially inflated, and relying directly or indirectly upon the fraudulent scheme engaged in by the Rule 10b-5(a) and (c) Defendants, and upon the integrity of the market in which the Company's common stock trades, or upon the absence of material adverse information that was knowingly and/or recklessly concealed by the Rule 10b-5(a) and (c) Defendants' misconduct, Lead Plaintiff and the other members of the Class purchased Galectin's common stock during the Class Period at artificially inflated prices.  As the truth eventually emerged, the price of Galectin's common stock substantially declined.

140.    At the time of the stock promotion scheme alleged herein, Lead Plaintiff and the other members of the Class were ignorant of the fact that the price of Galectin common shares had been artificially inflated by the Rule 10b-5(a) and (c) Defendants' misconduct.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth with respect to the business, operations, performance, and prospects of Galectin, which was concealed by the Rule 10b-5(a) and (c) Defendants' fraudulent scheme, Lead Plaintiff and the other members of

the Class would not have purchased Galectin's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

141.    By virtue of the foregoing, the Rule 10b-5(a) and (c) Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

142.    As a direct and proximate result of the Rule 10b-5(a) and (c) Defendants' fraudulent scheme, Lead Plaintiff and the other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## **COUNT III**

### **For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants and Defendant 10X Fund**

143.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against the Individual Defendants and Defendant 10X Fund.

144.    During the Class Period, the Individual Defendants were senior executive officers, directors, and Defendant 10X Fund was the beneficial owner of all of the issued and outstanding shares of Galectin's Series B preferred stock.  As such, each of these Defendants was privy to confidential and proprietary information concerning Galectin, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

145.    At all relevant times, Defendant Callicutt served as the Company's CFO, Defendant Czirr served as Executive Chairman of the Board, Defendant Martin served as a director, Defendant Mauldin served as a director, and Defendant Traber served as the Company's CEO, President, CMO, and a director.

146.   Defendant 10X Fund beneficially owned all of the issued and outstanding shares of Galectin's Series B preferred stock at all relevant times.  Through its ownership of Galectin Series B preferred stock, Defendant 10X Fund was entitled to:  (i) elect three directors to the Company's Board in a separate class vote; (ii) nominate three directors for election by all shares entitled to vote; and (iii) provide or withhold consent to a range of fundamental corporate actions that the Company may have wished to undertake, such as recapitalization, sale of the Company, and other matters.

147.   By reason of the foregoing, the Individual Defendants and Defendant 10X Fund had regular access to non-public information about Galectin's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

148.   The Individual Defendants and Defendant 10X Fund acted as controlling persons of Galectin within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants and Defendant 10X Fund had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiff alleges were materially false and misleading.  The Individual Defendants and Defendant 10X Fund were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead

Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements and/or to cause the statements to be corrected.

149.   In particular, the Individual Defendants and Defendant 10X Fund had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

150.   As set forth above, Galectin and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of the Individual Defendants' and Defendant 10X Fund's status as controlling persons, and/or their participation in the underlying violation of Section 10(b) and Rule 10b-5, the Individual Defendants and Defendant 10X Fund are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' and Defendant 10X Fund's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of himself and the other members of the Class, prays for relief and judgment, including:

A.   Determining that Counts I, II, and III of this action constitute a proper class action under Federal Rules of Civil Procedure 23, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff's counsel as Lead and Liaison Counsel for the Class;

B.   Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

51

Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.      Awarding Lead Plaintiff and the other members of the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

D.      Awarding such other and further relief as may be just and proper.


## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.


Dated:  May 8, 2015                    Respectfully Submitted,

                                       */s/ Ross A. Albert*
                                       **MORRIS, MANNING & MARTIN, LLP**
                                       Ross A. Albert (Ga. Bar No. 007749)
                                       1600 Atlanta Financial Center
                                       3343 Peachtree Road, N.E.
                                       Atlanta, Georgia 30326
                                       Telephone: (404) 233-7000
                                       Facsimile: (404) 365-9532
                                       raa@mmmlaw.com

                                       *Liaison Counsel for Lead Plaintiff and the Class*

                                       **KESSLER TOPAZ**
                                       **MELTZER & CHECK LLP**
                                       Michael K. Yarnoff (*pro hac vice pending*)
                                       myarnoff@ktmc.com
                                       Kimberly A. Justice (*pro hac vice pending*)
                                       kjustice@ktmc.com
                                       280 King of Prussia Road
                                       Radnor, PA 19087
                                       Telephone: (610) 667-7706
                                       Facsimile: (610) 667-7056

                                       *Lead Counsel for Lead Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 8, 2015 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 8, 2015.


<u>*/s/Ross A. Albert*</u>
Ross A. Albert