## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **IN RE GALECTIN** | : | |
| **THERAPEUTICS, INC.** | : | **CIVIL ACTION NO.** |
| **SECURITIES LITIGATION** | : | **1:15-CV-29-SCJ** |
|  | : | |

### ORDER

This matter appears before the Court on Galectin Therapeutics, Inc. ("Galectin"), James C. Czirr, Rod D. Martin, Peter G. Traber, Jack W. Callicutt, and John F. Mauldin's Motion to Dismiss (Doc. No. [117]) and 10X Fund L.P.'s ("10X Fund") Motion to Dismiss (Doc. No. [118]). Defendants move to dismiss with prejudice the Consolidated Class Action Complaint ("CCAC") (Doc. No. [111]) for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), Federal Rule of Civil Procedure 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4, 78u-5.

AO 72A
(Rev 8/82)

## I. FACTUAL BACKGROUND[1]

On July 30, 2014, Marissa Ballesteros, individually and on behalf of all others similarly situated, filed a Complaint in the United States District Court for the District of Nevada against Galectin, Czirr, Traber, and Callicutt alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Doc. No. [1]. On August 21, 2014, upon stipulation of the parties, the United States District Court for the District of Nevada consolidated the action filed by Ballesteros with two other putative securities class actions brought by shareholders of Galectin against the same defendants. Doc. No. [7]. The consolidated cases were captioned "In re Galectin Therapeutics, Inc. Securities Litigation." Doc. No. [7].

On September 3, 2014, Galectin, Czirr, Traber, and Callicutt filed an unopposed motion in the securities class action with the United States District

---

[1] "In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff." Speaker v. U.S. Dep't of Health and Human Servs. Ctrs. for Disease Control and Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010). While the Court accepts the factual allegations as true and construes them in the light most favorable to Plaintiff, securities fraud claims are subject to heightened pleadings standards that must be met to survive a motion to dismiss. In re AIG Advisor Group Securities Litigation, 309 F. App'x 495, 497 (2nd Cir. 2009). Plaintiff must plead with particularity the circumstances constituting fraud. Id.

Court for the District of Nevada to transfer venue to the United States District Court for the Northern District of Georgia. Doc. No. [23]. On September 29, 2014, Galectin, Traber, Czirr, Callicutt, Martin, Mauldin, and additional defendants in a related derivative action filed a second unopposed motion to transfer venue to the United States District Court for the Northern District of Georgia. Doc. No. [27]. The United States District Court for the District of Nevada granted the motions and transferred venue to the United States District Court for the Northern District of Georgia on January 5, 2015. Doc. No. [85]. After transfer of venue, on March 24, 2015, the Court granted Movant Glyn Hotz's Motion for Appointment as Lead Plaintiff and his Selection of Counsel, which was filed in the United States District Court for the District of Nevada prior to transfer of venue. Doc. No. [104].

On May 8, 2015, Lead Plaintiff Hotz filed the CCAC against Galectin, 10X Fund, Czirr, Martin, Traber, Callicutt, and Mauldin alleging violations of the Exchange Act. Doc. No. [111]. The CCAC includes three counts for violations of the Exchange Act: (1) Count I — Violations of Section 10(b) of the Exhange Act and Rule 10b-5(b) promulgated thereunder, (2) Count II — Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated

3

thereunder, and (3) Count III—Violations of Section 20(a) of the Exchange Act. In the CCAC, Plaintiff sets forth the following factual allegations.

Lead Plaintiff Hotz purchased shares of Galectin common stock during the class period of October 25, 2013, through July 28, 2014, and suffered losses as a result of the conduct set forth in the CCAC. Doc. No. [111], p. 7, ¶ 11. Incorporated in the State of Nevada and headquartered in Norcross, Georgia, Galectin is a biotechnology company engaged in the research of galectin proteins to develop therapies for cancer and non-alcoholic steatohepatitis ("NASH"), or fatty liver disease with advanced fibrosis. Doc. No. [111], p. 7, ¶ 12. 10X Fund and its general partner, 10X Capital Management, LLC, were co-founded by Czirr and Martin in 2008 as a technology-focused hedge fund headquartered in Niceville, Florida. Doc. No. [111], p. 7, ¶ 13. As of March 20, 2015, 10X Fund owned all of the issued and outstanding shares of Galectin Series B preferred stock, as well as warrants exercisable to purchase additional common stock. Doc. No. [111], p. 8, ¶ 13. Czirr was a managing partner of 10X Fund and served as Executive Chairman of Galectin's Board of Directors during the class period. Doc. No. [111], pp. 8-9, ¶¶ 13-14. Martin was also a managing partner of 10X Fund and served as Vice Chairman of Galectin's Board of Directors during the

4

class period. Doc. No. [111], pp. 8-9, ¶¶ 13, 15. Traber served as President, Chief

Executive Officer, Chief Medical Officer, and director of Galectin during the class

period. Doc. No. [111], p. 9, ¶ 16. Callicuttt served as the Chief Financial Officer

of Galectin during the class period. Doc. No. [111], p. 10, ¶ 17. Mauldin served

as a director of Galectin during the class period. Doc. No. [111], p. 10, ¶ 18.

Mauldin also published investment advice to paying subscribers through a

website called Mauldin Economics. Doc. No. [111], p. 10, ¶ 18. Mauldin

Economics employed various editors, including Patrick Cox, who contributed

research on small-cap biotech companies through a fee-based publication titled

"Transformational Technology Alert." Doc. No. [111], p. 10, ¶ 18.

On January 31, 2013, Galectin announced that it had submitted to the FDA

an Investigational New Drug application to conduct a study of its new drug

candidate, GR-MD-02. Doc. No. [111], p. 12, ¶ 27. GR-MD-02 is a complex

polysaccharide polymer for the treatment of fatty liver disease, or NASH, with

advanced fibrosis. Doc. No. [111], pp. 4-5, ¶ 2. Thereafter, on February 1, 2013,

Galectin announced that it had entered into an agreement with CTI Clinical Trial

Services, Inc. to conduct a Phase I clinical trial of GR-MD-02 to assess the drug's

safety and preliminary efficacy in humans. Doc. No. [111], p. 12, ¶ 27. After

Galectin received FDA authorization to commence its Phase I clinical trial, the company began enrolling the first patients in the study in July 2013.   Doc. No. [111], pp. 12–13, ¶ 27.

While Galectin was proceeding with Phase I testing of GR-MD-02, on October 25, 2013, the company launched an "at-the-market" ("ATM") offering of up to $30 million of company stock.  Doc. No. [111], p. 5, ¶ 4; Doc. No. [111], p. 13, ¶ 29; Doc. No. [111], p. 15, ¶ 36.  Galectin entered into an agreement with MLV & Co. ("MLV") whereby MLV acted as Galectin's agent in the sale of the company's shares.  Doc. No. [111], p. 5, ¶ 5; Doc. No. [111], p. 13, ¶ 29.  Galectin disclosed in a press release attached to the company's Form 8-K filed with the United States Securities and Exchange Commission ("SEC") on January 10, 2014, that in connection with the October 25, 2013, ATM offering, during the period of October 28, 2013, through January 9, 2014, Galectin sold a total of 2,391,204 shares of its common stock at an average price per share of $9.99, for total gross proceeds of $23,883,137.  Doc. No. [111], p. 14, ¶ 33.  On March 21, 2014, Galectin initiated a second ATM offering of up to another $30 million of company stock.  Doc. No. [111], p. 5, ¶ 4; Doc. No. [111], p. 14, ¶ 34; Doc. No. [111], p. 15, ¶ 36. Galectin again entered into an agreement with MLV whereby MLV acted as

6

Galectin's agent in the sale of the company's shares.  Doc. No. [111], p. 5, ¶ 5; Doc. No. [111], p. 14, ¶ 34. Galectin represented that it would not take any action that would result in the "manipulation" of the price of its common stock that Galectin was offering for sale.  Doc. No. [111], p. 5, ¶ 5.  At the time Galectin announced the March 21, 2014, ATM offering, its shares were trading at an average price of $15.31 per share. Doc. No. [111], p. 15, ¶ 35. Galectin disclosed in its annual report for the year ended December 31, 2014, in a Form 10-K filed with the SEC on March 18, 2015, that "[a]s of December 31, 2014, the Company had issued 217,622 shares of its common stock through [the March 21, 2014, ATM offering] resulting in gross proceeds of approximately $1,196,000."   Doc. No. [111], p. 15, ¶ 35.

During the class period, Galectin retained multiple stock promoters — between two and four — to promote the company's stock. Doc. No. [111], pp. 15-16, ¶ 37. Plaintiff alleges that Galectin worked with the following stock promoters: (1) Acorn Management Partners, LLC ("Acorn"), (2) TDM Financial/Emerging Growth Corp. ("TDM"), (3) Cox, and (4) The Dream Team/Mission IR ("Dream Team").  Doc. No. [111], p. 16, ¶ 38.  The stock promoters published various articles about Galectin and its development of GR-

7

MD-02. Doc. No. [111], p. 17, ¶ 40; Doc. No. [111], p. 18, ¶¶ 42, 45–46; Doc. No.

[111], p. 19, ¶ 49; Doc. No. [111], pp. 19–20, ¶ 51. Plaintiff alleges that Galectin

did not disclose its relationship with Dream Team, Cox, and TDM, and that it

failed to fully and accurately disclose its relationship with Acorn. Doc. No. [111],

p. 16, ¶ 38. Specifically, Plaintiff alleges that Galectin did not properly disclose

to shareholders that it paid the promoters compensation, or that the promoters

otherwise had an economic interest in Galectin. Doc. No. [111], p. 17, ¶ 41; Doc.

No. [111], p. 18, ¶ 43; Doc. No. [111], p. 19, ¶ 50; Doc. No. [111], p. 20, ¶¶ 52–53.

Essentially, Galectin issued numerous press releases during the Phase I trial of

GR-MD-02 detailing the results, the stock promoters issued articles at or near the

same time as Galectin issued its press releases, and the press releases and articles

were issued during the period of time that Galectin conducted its ATM offerings.

Doc. No. [111], pp. 21–25, ¶¶ 54–66. Between the time Galectin announced its

submission of an Investigational New Drug Application to conduct the Phase I

trial of GR-MD-02 in January 2013 and the time it issued a press release on July

25, 2015, during which the ATM offerings occurred, the price of Galectin's

common stock increased from approximately $2 per share to as high as $19 per

share. Doc. No. [111], p. 25, ¶ 67. Galectin represented through various means

that it did not engage in any conduct to manipulate the company's stock price. Doc. No. [111], p. 26, ¶¶ 68-70. On July 25, 2014, and July 28, 2014, respectively, Adam Feuerstein, an investment commentator for *TheStreet*, and Bleaker Street Research, posted articles discussing Galectin's use of stock promoters, some of whom received compensation, to promote the company's stock. Doc. No. [111], pp. 27-28, ¶¶ 72-76. Galectin's stock price dropped from $15.91 per share at the opening of the markets on July 28, 2014, to $7.10 per share at the opening of the markets on July 29, 2014, a drop of more than 55 percent. Doc. No. [111], p. 29, ¶ 77.

Plaintiff alleges that Galectin made false and misleading statements during the class period. Doc. No. [111], pp. 29-34, ¶¶ 78-91. For example, in its agreement with MLV filed with the SEC on October 25, 2013, which was later amended on March 21, 2014, Galectin made the following representation:

> Neither the Company, nor any Subsidiary, nor any of their respective directors, officers or controlling persons has taken, directly or indirectly, any action designed, or that has constituted or would reasonably be expected to cause or result in, under the Exchange Act or otherwise, the stabilization or manipulation of

9

> the price of any security of the Company to facilitate
> the sale or resale of the Placement Shares.

Doc. No. [111], p. 29, ¶¶ 78–79; Doc. No. [111], p. 33, ¶¶ 87–88. Galectin further stated, "The Company will not, directly or indirectly, (i) take any action designed to cause or result in, or that constitutes or would reasonably be expected to constitute, the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of Common Stock." Doc. No. [111], p. 29, ¶ 79. Plaintiff also identifies forms filed with the SEC and press releases by Galectin that he contends were materially false or misleading for failing to disclose that the company hired stock promoters during the ATM offerings. Doc. No. [111], pp. 32–34, ¶¶ 81–91. In addition to the allegations with respect to Galectin, Plaintiff alleges that the stock promoters omitted material facts from their articles, including their receipt of compensation from Galectin. Doc. No. [111], pp. 35–38, ¶¶ 92–99.

On June 26, 2015, Galectin, Czirr, Martin, Traber, Callicutt, and Mauldin filed a Motion to Dismiss for Failure to State a Claim (Doc. No. [117]) and 10X Fund filed a Motion to Dismiss for Failure to State a Claim (Doc. No. [118]). The parties have briefed the motions and the Court heard oral argument with respect

10

to the motions on November 3, 2015 (Doc. No. [128]). The motions are now ripe

for consideration by the Court.

## II. LEGAL STANDARD

A complaint may be dismissed if the facts as pled do not state a claim for

relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)

(explaining "only a complaint that states a plausible claim for relief survives a

motion to dismiss"); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561-62, 570

(2007) (retiring the prior Conley v. Gibson, 355 U.S. 41, 45-46 (1957) standard

which provided that in reviewing the sufficiency of a complaint, the complaint

should not be dismissed "unless it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief").

In Iqbal, the Supreme Court reiterated that although Rule 8 of the Federal Rules

of Civil Procedure does not require detailed factual allegations, it does demand

"more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

Iqbal, 556 U.S. at 678.

In Twombly, the Supreme Court emphasized a complaint "requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." 550 U.S. at 555. Factual allegations in a complaint need

11

not be detailed but "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (internal citations and emphasis omitted).

Because Plaintiff asserts securities fraud claims against Defendants, Plaintiff must also satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008). Federal Rule of Civil Procedure 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The United States Court of Appeals for the Eleventh Circuit has held,

> "Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'"

Mizzaro, 544 F.3d at 1237. In addition, the PSLRA, Pub. L. No. 104-67, 109 Stat. 737 (1995), imposes a heightened pleading standard for scienter. Id. at 1238. Plaintiff must, "with respect to each act or omission alleged to violate [the

12

relevant code section], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## III. DISCUSSION

### A. Count I: Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC, states the following:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the

13

> statements made, in the light of the
> circumstances under which they were
> made, not misleading, or
>
> (c) To engage in any act, practice, or
> course of business which operates or
> would operate as a fraud or deceit upon
> any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Regarding a cause of action under section 10(b), the United

States Supreme Court has held,

> To recover damages for violations of section 10(b) and
> Rule 10b-5, a plaintiff must prove "'(1) a material
> misrepresentation or omission by the defendant;
> (2) scienter; (3) a connection between the
> misrepresentation or omission and the purchase or sale
> of a security; (4) reliance upon the misrepresentation or
> omission; (5) economic loss; and (6) loss causation.'"

Halliburton Co. v. Erica P. John Fund, Inc., 134 S.Ct. 2398, 2407 (2014). In Count I

of the CCAC, Plaintiff asserts a claim that Galectin, Callicutt, and Traber violated

section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by

making "materially false and misleading statements and omissions of material

fact." Doc. No. [111], pp. 47–50, ¶¶ 125–34. Specifically, in response to

Defendants' motions to dismiss, Plaintiff argues that Defendants lied to investors

by assuring that Galectin had not taken any action designed to cause or result in

manipulation of the company's stock price, and failed to disclose Galectin's

14

"fraudulent stock promotion scheme." Doc. No. [119], pp. 7–8; Doc. No. [119], pp. 12–23.

To the extent that Plaintiff bases his Rule 10b-5(b) claim on the articles by the stock promoters, the Supreme Court has foreclosed the claim. The Supreme Court has held that a defendant must have "made" the untrue statement to be liable for a violation of Rule 10b-5(b).  Janus Capital Group, Inc. v. First Derivative Traders, 131 S.Ct. 2293, 2301 (2011). "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." Id. at 2302. Ultimately, the Supreme Court adopted the following rule: "[T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it."  Id. at 2303.  While Plaintiff has set forth allegations that Defendants worked in conjunction with stock promoters to promote Galectin's stock, particularly with respect to the timing of articles by the stock promoters and company press releases, Plaintiff has not included sufficient allegations that support a finding that Galectin had ultimate authority or control over the stock promoters' statements. Even if Galectin provided assistance crafting the stock promoters' articles, that is not sufficient to support a claim under Rule 10b-5(b). See id. at 2304-05. Even if Plaintiff sufficiently pled allegations that Defendants were

15

the maker of the articles, Plaintiff does not challenge the veracity of the claims set forth in the articles.  In response to Defendants' motions to dismiss, Plaintiff states, "Plaintiff does not challenge under § 10(b) a single substantive statement in the Stock Promoters' articles."  Doc. No. [119], p. 18 n.5.  Plaintiff also states, "Plaintiff's claims are not premised on the actual statements made in the Stock Promoters' articles."  Doc. No. [119], p. 24 n.10.  Rule 10b-5(b) prohibits the making of an untrue or misleading statement, yet Plaintiff indicates that he does not challenge any statements in the Stock Promoters' articles.

Neither has Plaintiff sufficiently pled factual allegations that Defendants made untrue statements or omitted material facts. Section 17(b) of the Exchange Act imposes a duty to disclose that a stock promoter received consideration for promoting a company's securities. 15 U.S.C. § 77q(b).  Specifically,

> It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicly to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77q(b). Based on the language of the statute, the duty to disclose rests on the stock promoters, not Defendants.  For the Court to impose a duty to

16

disclose on Defendants would encroach on the drafter's decision to create a duty to disclose on analysts, such as stock promoters, rather than the issuer of a regulated security. Furthermore, Plaintiff has not otherwise set forth factual allegations that Defendants took actions designed to cause or result in manipulation of the company's stock price or a fraudulent stock promotion scheme. While Plaintiff alleges that Defendants retained stock promoters, those allegations do not create a cause of action under Rule 10b-5(b). "It may seem odd to the uninitiated, but nothing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock recommendation." Garvey v. Arkoosh, 354 F. Supp. 2d 73, 83 (D. Mass. 2005). In Garvey, the district court noted, "[T]he approach taken by the securities laws — in practical recognition of the fact that most market research is performed by analysts who are paid by brokerage firms, investment banks, and other marketers of securities — is to require disclosure of the fact that the analyst has been paid." Id. The purpose of stock promoters is to promote a company and its stock, thereby increasing the value or price of the stock. Because it is permissible to use stock promoters, Defendants did not impermissibly manipulate the company's stock price. Moreover, the cases cited by Plaintiff to support his Rule 10b-5(b) claim — In re CytRx Corp. Sec. Litig., 2015 WL 5031232 (C.D. Calif. July 13, 2015) and In re Galena Biopharma, Inc. Sec. Litig., 2015 WL 4643474 (D. Ore. Aug. 5, 2015) — differ significantly from the present case. In In re CytRx, the authors of

17

the articles were named as defendants to the action, and there were allegations that the company "edited and approved the articles before publication," and that the articles were published using aliases. In re CytRx, 2015 WL 5031232 at *2. In In re Galena, the plaintiffs set forth allegations that the stock promoters used aliases, and the company required that it approve every article prior to publication. In re Galena, 2015 WL 4643474 at *2–*6. Plaintiff merely alleges that Galectin used stock promoters to increase the price of its stock and Defendants did not disclose this arrangement to investors. These allegations are insufficient to support a claim under Rule 10b-5(b).

Plaintiff has failed to state a claim for relief under section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder. First, Defendants are not the makers of the articles, nor does Plaintiff challenge the statements set forth in the articles. Second, Defendants did not have a duty to disclose that Galectin retained stock promoters. Third, Defendants did not engage in impermissible actions to manipulate the price of its shares.

**B. Count II: Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder**

Rule 10b-5(a) and (c), which form the basis of Count II of the CCAC, differ from Rule 10b-5(b). Rule 10b-5(a) concerns "any device, scheme, or artifice to defraud," and Rule 10b-5(c) concerns "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17

18

C.F.R. § 240.10b-5. Recognizing the difference between these rules, the United States Court of Appeals for the Ninth Circuit has noted, "Courts have generally held that '[a] Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim.'" WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011). After previously suggesting that it was not permissible for "allegations underpinning a Rule 10b-5(b) omissions claim [to] be recast as [a] Rule 10b-5(a) or (c) claim," the Ninth Circuit held that "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." Id.

With respect to Count II of the CCAC, Plaintiff "repeats and realleges each and every allegation" set forth in the preceding paragraphs of the CCAC. Doc. No. [111], p. 50, ¶ 135.[2] Plaintiff does not identify any factual allegations that form the basis of Count II that are separate from the factual allegations that form the basis of Count I. Compare Doc. No. [111], pp. 47–50, ¶¶ 125–34 with Doc. No. [111], pp. 50–52, ¶¶ 135–42. However, in response to the motions to dismiss,

_____

[2] The CCAC is a quintessential shotgun pleading. The United States Court of Appeals for the Eleventh Circuit defines shotgun pleadings as "those that incorporate every antecedent allegation by reference into each subsequent claim for relief or affirmative defense." Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1279 (11th Cir. 2006). "'[S]hotgun pleadings wreak havoc on the judicial system.'" Id.

19

Plaintiff argues, "Plaintiff has alleged conduct that is separate and distinct from Defendants' material misstatements and omissions, 'including the hiring of promoters, planning . . . well-timed articles with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the Company's involvement.'"  Doc. No. [119], p. 28.  The factual allegations that Plaintiff contends are separate from those that form the basis of the Rule 10b-5(b) claim are not prohibited, such as working with stock promoters and planning the timing of articles, and, fundamentally, are nothing more than an omission claim—i.e., covering up or failing to disclose Galectin's involvement in the promotion of its stock.  Plaintiff has failed to state a claim for relief under Rules 10b-5(a) and (c).

### C.  Count III: Violations of Section 20(a) of the Exchange Act

The final claim set forth in the CCAC is for violations of section 20(a) of the Exchange Act, which states the following:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or

20

> indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t(a).  With respect to claims brought under section 20(a) of the

Exchange Act, the United States Court of Appeals for the Eleventh Circuit has

held, "To state a claim under section 20(a) a complaint must allege that primary

liability under section 10(b) exists; the defendant had the 'power to control the

general business affairs of [the corporation]'; and the defendant had the power

to 'control or influence the specific corporate policy which resulted in primary

liability.'"   Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009).  Here, the

Court has found that Plaintiff failed to state a claim for primary liability under

section 10(b) of the Exchange Act, therefore there can be no secondary liability

under section 20(a).

## D. Leave to Amend

In the conclusion section of Plaintiff's response to the motions to dismiss,

he states, "If the Court perceives any portion of the [CCAC] to be insufficient,

Plaintiff respectfully requests leave to amend to cure any noted deficiencies

pursuant to Rule 15(a)(2)." Doc. No. [119], p. 31. Federal Rule of Civil Procedure

15(a)(1) provides that a party may amend its pleading once as a matter of course

within either twenty-one days after serving it, or twenty-one days after service

of a required responsive pleading or motion filed under Rule 12(b), (e), or (f),

whichever is earlier.  Fed. R. Civ. P. 15(a)(1).  After this twenty-one-day period

21

has passed, a party may amend its pleading only with the opposing party's

written consent or the court's leave, which the court "should freely give . . . when

justice so requires."  Fed. R. Civ. P. 15(a)(2).

The United States Court of Appeals for the Eleventh Circuit has held:

> The thrust of Rule 15(a) is to allow parties to have their
> claims heard on the merits, and accordingly, district
> courts should liberally grant leave to amend when "the
> underlying facts or circumstances relied upon by a
> plaintiff may be a proper subject of relief." Foman v.
> Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222
> (1962). Nevertheless, a motion for leave to amend may
> appropriately be denied "(1) where there has been
> undue delay, bad faith, dilatory motive, or repeated
> failure to cure deficiencies by amendments previously
> allowed; (2) where allowing amendments would cause
> undue prejudice to the opposing party; or (3) where
> amendment would be futile." Bryant v. Dupree, 252
> F.3d 1161, 1163 (11th Cir. 2001).

In re Engle Cases, 767 F.3d 1082, 1108–09 (11th Cir. 2014).

It has been held that "[l]eave to amend a complaint is futile when the

complaint as amended would still be properly dismissed or be immediately

subject to summary judgment for the defendant." Cockrell v. Sparks, 510 F.3d

1307, 1310 (11th Cir. 2007); see also Hall v. United Ins. Co. of Am., 367 F.3d 1255,

1263 (11th Cir. 2004) ("This court has found that denial of leave to amend is

justified by futility when the complaint as amended is still subject to dismissal.")

The Eleventh Circuit has also held, "'Where a request for leave to file an

amended complaint simply is imbedded within an opposition memorandum, the

22

issue has not been raised properly.'" Rosenberg, 554 F.3d 962, 967 (2009). In this case, Plaintiff has not properly raised the issue of amendment. Further, even if Plaintiff's request for leave to amend is properly raised, the Court finds that leave to amend the complaint is futile. The operative complaint is an amended complaint filed by Plaintiff upon transfer of this matter to this Court. And Plaintiff failed to state a claim for relief not due to a lack of specificity, but because the alleged misstatements, omissions, and scheme do not form the basis of a claim against Defendants under the Exchange Act.

## IV. CONCLUSION

Galectin, Czirr, Martin, Traber, Callicutt, and Mauldin's Motion to Dismiss (Doc. No. [117]) and 10X Fund's Motion to Dismiss (Doc. No. [118]) are **GRANTED**. This matter is hereby **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED, this _30th_ day of _December_, 2015.

HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE